# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
November 12, 2014 Session

## CADENCE BANK, N.A. v. THE ALPHA TRUST, ET AL.

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-12-0654-3     Kenny W. Armstrong, Chancellor

### No. W2014-01151-COA-R3-CV - Filed February 25, 2015

In this action to collect on a promissory note, the trial court granted summary judgment to the bank. Appellants appeal the trial court's decisions regarding whether the bank was properly doing business in the State of Tennessee and whether the Appellants' two contract-based counter-claims fail as a matter of law. Discerning no error regarding the trial court's finding that the bank was properly doing business in the State, we affirm the trial court's ruling in that regard.  We also affirm the trial court's finding that the bank was entitled to summary judgment on the contract-based counterclaims.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., joined.  J. STEVEN STAFFORD, P.J., W.S., filed a separate opinion dissenting in part.

Kevin A. Snider, Germantown, Tennessee, for the appellants, The Alpha Trust; The M.S.U. Family Trust; The D.S.U. Family Trust; Marvin V. Uthe; Shirley A. Uthe; Sandra L. Uthe; and David B. Uthe.

T. Robert Abney, Memphis, Tennessee, for the appellee, Cadence Bank, N.A.

# OPINION

## Background

On April 4, 2001, the Alpha Trust, the M.S.U. Family Trust, and the D.S.U. Family Trust,[1] (collectively, "the Trusts"), through their authorized representatives[2] (together with the Trusts, "Appellants") executed a Promissory Note in the principal amount of $476,000.00 in favor of Enterprise National Bank, later known as Cadence Bank, N.A. ("Cadence Bank" or "the Bank") for the purchase of real property located in Cordova, Tennessee. The Note was secured by a Deed of Trust. The Note stated that it would commence on May 10, 2001 and provided for fifty-nine installments in the amount of $4,097.00 each at an interest rate of 8.25 percent. The parties' agreement also contained a balloon payment scheduled to mature on April 10, 2006. The Note was initialed on every page and signed on the final page by each trustee, Marvin V. Uthe and Shirley A. Uthe, as Trustees for the M.S.U. Family Trust, and as Trustees for the Alpha Trust; and Sandra L. Uthe and David B. Uthe, Trustees for the D.S.U. Family Trust (hereinafter "the Trustees"). The Trustees also executed Trust Secretary's Certificates. Additionally, the Trustees, in their individual capacities, each executed a Guaranty that by its terms guaranteed payment of the Note.

Despite the provision in the Note providing that the final balloon payment would mature on April 10, 2006, according to Appellants, they were repeatedly assured by Cadence Bank that they would be able to refinance the debt so long as they continued to make timely payments. On May 10, 2006, the parties entered into a Modification Agreement. The Modification Agreement indicates that it is made between Appellants and "CADENCE BANK, N.A., a national banking association (formerly Enterprise National Bank)."[3] The

---

[1]The D.S.U. Family Trust and the Trustees of the D.S.U. Family Trust have filed Chapter 11 bankruptcy. On November 26, 2014, the United States Bankruptcy Court for the Western District of Tennessee entered an order lifting the automatic stay permitting this Court to proceed and "enter such orders therein as may be appropriate according to its own rules without regard to th[e] [bankruptcy] proceeding now pending."

[2]The trusts' representatives, and named defendants, include: Marvin V. Uthe, individually, as Trustee for the M.S.U. Family Trust, and as Trustee for the Alpha Trust; Shirley A. Uthe, individually, as Trustee for the M.S.U. Family Trust, and as Trustee for the Alpha Trust; Sandra L. Uthe, individually and as Trustee for the D.S.U. Family Trust; and David B. Uthe in his capacity as Trustee for the D.S.U. Family Trust. The trusts' representatives participated in this appeal in both their representative and individual capacities, with the exception of David B. Uthe, who only participated in his representative capacity.

[3]Appellants claim that they were unaware that Enterprise National Bank had changed its name to Cadence Bank, N.A. However, the parties' Modification Agreement states that it is "by and between CADENCE BANK, N.A., a national banking association (formerly Enterprise National Bank) ("Lender")"

agreement further provides that the principal balance remaining from the original Note was $423,220.70. Accordingly, this amount was refinanced at 8.00 percent interest payable in fifty-nine installments of $4,073.49 each. The Modification Agreement further provided for another balloon payment scheduled on April 10, 2011. The Modification Agreement was signed by all four trustees and was accompanied by four Trust Secretary's Certificates executed by each of the four trustees.[4] According to Appellants, Cadence Bank representatives indicated that Appellants would be able to refinance the debt again when the balloon payment matured.

On June 24, 2011, the parties executed a Change in Terms Agreement. The record indicates that Cadence Bank sent at least seven letters (January 21, March 2, April 8, April 21, May 4, May 12, and June 13, 2011) to Appellants before it was able to collect enough financial information from Appellants to execute the new Change in Terms Agreement. Four of the letters contain a provision stating: "Cadence Bank has not obtained an appraisal since 2001. In order to consider a renewal we will also need to order an appraisal at your expense." Despite this statement, however, an appraisal was not completed prior to the execution of the June 24, 2011 Change in Terms Agreement. The Change in Terms Agreement extended the maturity date of the loan to September 10, 2011. The principal balance at that time was $331,057.20. The Change in Terms Agreement provided for payment in "two regular payments of $4,073.49 each and one irregular last payment of $328,596.14." Again, the four representatives of the three trusts signed the Change in Terms Agreement.

Disputes arose regarding efforts to refinance the debt again prior to the scheduled September 10, 2011 balloon payment. Appellants contend that, prior to September 10, 2011, Cadence Bank again assured Appellants that they would be able to refinance the debt to avoid paying the balloon payment. Specifically, an affidavit later submitted by David B. Uthe, Trustee of the D.S.U Family Trust, states: "Leonard McKinnon . . .[, Executive Vice President for Cadence Bank,] made misleading statements to me by telling me that it was okay for the [Appellants] to renew the loan with no questions asked provided that said [Appellants] provide him with tax returns for the year 2010, wherein there was neither any follow up by said Mr. McKinnon nor was the loan renewal and/or refinance being processed." Appellants contend that they reasonably relied on this representation. Shortly thereafter, Cadence Bank ordered an appraisal and claimed that it revealed that the property was only worth $350,000.00. Appellants allege Cadence Bank refused or failed to provide a copy of the appraisal to Appellants.

and Appellants.

[4]The Trust Secretary's Certificates evinced the Trustees' authority to execute loan documents.

Cadence Bank does not deny that there were discussions leading up to the September 2011 maturity date regarding Appellants' desire to again refinance the debt. The Bank contends, however, that it fulfilled its obligation to Appellants and that Appellants refused to agree to new or additional terms, which were based on the appraisal of the property. According to Cadence Bank, on January 18, 2012, Leonard McKinnon (hereinafter "Mr. McKinnon"), Cadence Bank's Executive Vice President, sent a letter to Appellants offering to refinance the remaining balance. David Uthe testified at his deposition that he believed that this letter was hand delivered to him by Mr. McKinnon. In the letter, Cadence Bank offered to refinance a principal balance of $297,500.00, which represents eighty-five percent of the appraised value of $350,000.00. Thus, Appellants, had they accepted the new terms, would have been required to immediately reduce their existing balance of $334,472.25. Uthe testified that, upon receipt of the letter, he told Mr. McKinnon: "I said, this is what you're offering after this period of time, that you want me to come up with another 50 grand on a note? You could have restructured the note rather than doing this." Uthe stated that Mr. McKinnon replied, "Well this is all I have."

Several weeks later, on February 10, 2012, Cadence Bank sent another letter offering the same terms. The Bank asserts that Appellants neither accepted any of the new terms in the letter nor made any counteroffers regarding refinancing the debt. Moreover, Appellants did not obtain their own appraisal for the value of the property. Accordingly, counsel for Cadence Bank sent Appellants a letter on February 27, 2012, notifying them of the default and demanding repayment.

**Procedural History**

On April 16, 2012, Cadence Bank filed its Complaint against the Appellants based on a sworn affidavit of account. Cadence Bank alleged that Appellants owed a debt totaling $348,843.07, including an additional sum added for payment of lapsed insurance, plus accrued interest and late charges. Cadence Bank also asserted that interest was accruing at a rate of $71.327 per day.

Appellants filed their Answer and Counter Complaint against Cadence Bank on June 29, 2012. The Counter Complaint alleged that Cadence Bank "repeatedly assured" the Appellants over the years that their short-term notes would be refinanced "as long as they timely made payments on the note etc." Appellants also alleged that they detrimentally relied on these representations. The Counter Complaint also asserted that Cadence Bank's actions and omissions breached the implied covenant of good faith and fair dealing. Cadence Bank answered the Counter Complaint on August 15, 2012.

A few months later, on October 18, 2012, Appellants filed a motion to dismiss. In

their motion, Appellants alleged that Cadence Bank was not properly doing business in the State of Tennessee and that it accordingly could not maintain a lawsuit in the State. Appellants observed that, in Cadence Bank's complaint, it stated that it is "a national banking association, organized and existing under the laws of the United States of America, [] it is authorized to do business in the State of Tennessee, and [] it maintains a principal business office at 6075 Poplar Avenue, Suite 120, Memphis, Shelby County, Tennessee." Appellants also noted that, according to Cadence Bank's website, it operates "more than 100 branch locations in Alabama, Florida, Georgia, Mississippi, Tennessee, and Texas." Appellants claimed that Cadence Bank was required to obtain a certificate of authority prior to transacting business in this State and that the Bank was required to maintain a registered agent and/or office in this State pursuant to Tennessee law. Appellants attached "screen shots" to their motion that demonstrated an online query for "Cadence Bank, N.A." using the Tennessee Secretary of State's website. The search produced no results for Cadence Bank, N.A. as a registered corporation in Tennessee.

Cadence Bank responded to Appellant's Motion to Dismiss on October 26, 2012, and disputed Appellants' assertion that it was not *properly* doing business in the State of Tennessee. The Bank argued that it is a national bank subject to the National Bank Act and that the National Bank Act, 12 U.S.C.A. § 24, preempts State law in the regulation of national banks. Specifically, Cadence Bank claimed that the National Bank Act, as codified at 12 U.S.C.A. § 24, authorizes it "[t]o sue and be sued, complain and defend, in any Court of law and equity, as fully as natural persons." Accordingly, the Bank claimed that "[t]he federal government has preempted the issue of national banks doing business within the several States including Tennessee."

Cadence Bank filed a Motion for Summary Judgment on January 4, 2013, including a Statement of Undisputed Facts and the affidavit of Mr. McKinnon. In his affidavit, Mr. McKinnon swore that the three trusts and their four representatives were liable to Cadence Bank for the principal balance of $334,472.25, accrued interest totaling $34,264.82, and contractually provided late charges totaling $100.00. In its motion for summary judgment, the Bank argued that no dispute of material fact existed as to whether the Appellants had defaulted on the loan. Cadence Bank also argued that Appellants' assertions of unclean hands, estoppel, lack of good faith and fair dealing, intentional misrepresentation, detrimental reliance, and failure to mitigate damages on behalf of the Bank were without merit. The Bank's motion for summary judgment also refuted Appellants' assertion that the Bank was not properly doing business in the State of Tennessee. The Bank submitted the affidavit of Jerry W. Powell, an Executive Vice President and Secretary for Cadence Bank, who stated that the Office of the Comptroller of the Currency of the United States of America had issued Cadence Bank's Certificate of Corporate Existence.

Appellants responded to the motion for summary judgment on February 13, 2013, and again argued that Cadence Bank was improperly doing business in the State of Tennessee. Appellants also argued that a genuine dispute of material fact existed as to Appellants' claims of estoppel, the implied duty of good faith and fair dealing, intentional misrepresentation, detrimental reliance, and the mitigation of damages.

On February 19, 2013, the trial court entered a written order granting summary judgment in favor of Cadence Bank, finding that there were no genuine issues of material fact as to the liability of Appellants on the Note or its modifications. Despite Appellants' contention that Cadence Bank failed in its promise to refinance the debt, the trial court specifically found that: "Cadence did extend an offer to modify the Promissory Note to the [Appellants], but that [Appellants] did not execute another modification agreement and did not accept the terms of this offer by Cadence[.]" The trial court also ruled that there "does not appear to be any real possibility that the [Appellants] can prove facts to substantiate either their defense to liability upon the Note and their Guaranties, or their claims against Cadence in their Counter-Complaint." This ruling effectively dismissed the claims appealed to this Court by Appellants, including the issues of preemption, the implied duty of good faith and fair dealing, and promissory estoppel. On April 2, 2014, the trial court entered a Final Order Granting Summary Judgment in favor of Cadence Bank in the amount of $427,434.83.[5] This Final Order Granting Summary Judgment in favor of Cadence Bank also dismissed Appellants' Counter-Complaint.

On May 1, 2014, Appellants filed a Motion to Alter or Amend the trial court's judgment, arguing that the trial court failed to address the issue of whether Cadence Bank was properly doing business in the State of Tennessee. On May 20, 2014, the trial court entered an order finding that Cadence Bank was properly doing business in Tennessee as a national bank and could properly bring a lawsuit against Appellants. Appellants timely filed their appeal on June 20, 2014.

**Issues Presented**

Appellants raise three issues for our review, as we have re-stated them:

1.      Whether the trial court erred when it found that Cadence Bank was properly doing business in the State of Tennessee and that the National Bank Act, 12 U.S.C. § 24, preempts the State's corporate requirements.

---

[5]The final judgment sum of $427,434.83 represents the due and owing principal balance of $334,472.25, the interest and contractual charges totaling $70,531.90, and attorney's fees totaling $22,430.68.

2.      Whether the trial court erred when it granted summary judgment to
        Cadence Bank on Appellants' claim that Cadence Bank breached the
        implied duty of good faith and fair dealing.

3.      Whether the trial court erred when it granted summary judgment to
        Cadence Bank on Appellants' claim of promissory estoppel.[6]

## Analysis

### *Federal Preemption of State Law Requirements for National Banks*

We begin with the issue of whether Cadence Bank is properly doing business in the State of Tennessee. Appellants argue that Cadence Bank cannot maintain a lawsuit in this State because Cadence Bank does not have a certificate of authority or a registered agent and/or office in this State.

Tennessee Code Annotated section 48-25-101(a) (2012) provides that a foreign corporation "may not transact business in this state until it obtains a certificate of authority from the secretary of state."[7] The following section further provides that "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority." Tenn. Code Ann. § 48-25-102(a) (2012). In addition, Tennessee Code Annotated section 48-25-107 (2012) states that "[e]ach foreign corporation authorized to transact business in this state shall continuously maintain in this state: (1) A registered office that may be the same as any of its places of business; and (2) A registered agent[.]"

Throughout these proceedings, Cadence Bank has not disputed that it is in fact a foreign corporation transacting business in the State of Tennessee within the meaning of these statutes. As noted above, Cadence Bank stated in its complaint that it "is a national banking association, organized and existing under the laws of the United States of America, that it is authorized to do business in the State of Tennessee, and that it maintains a principal business office at 6075 Poplar Avenue, Suite 120, Memphis, Shelby County, Tennessee 38119." During discovery, Cadence Bank also admitted that it is "a national banking association doing business in Shelby County, Tennessee." When Appellants argued that

---

[6]Appellants use the term "detrimental reliance," but that term is interchangeable with the term "promissory estoppel."

[7]The statute provides an exception for a foreign insurance corporation, but that exception is inapplicable here.

Cadence Bank was not *properly* doing business in this State, Cadence Bank disputed this assertion by arguing that it is "authorized to do business in Tennessee," authorized "to transact business in Tennessee," and "entitled to do business in the State of Tennessee because of its classification as a national banking organization." Thus, the parties do not dispute that Cadence Bank is transacting business in this State and, absent preemption by the National Bank Act, would be required to obtain a certificate of authority and maintain a registered agent and office in this State pursuant to Tennessee law.

The question then becomes whether the National Bank Act ("NBA") preempts these state law requirements as they pertain to a national bank such as Cadence Bank. "Our federal system of government recognizes the dual sovereignty of the federal government and the various state governments. The states possess sovereignty within their particular spheres concurrent with the federal government subject only to the limitations imposed by the Supremacy Clause." *BellSouth Telecomms, Inc. v. Greer*, 972 S.W.2d 663, 670 (Tenn. 1997) (citations omitted). The preemption doctrine originated in the Supremacy Clause of the United States Constitution. U.S. CONST. Art. VI, cl. 2; *BellSouth*, 972 S.W.2d at 670. Under the Supremacy Clause, if a state law conflicts with a federal law, it is "'without effect,'" *Coker v. Purdue Pharma Co.*, No. W2005-02525-COA-R3-CV, 2006 WL 3438082, at *5 (Tenn. Ct. App. Nov. 30, 2006) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)), and therefore displaced by federal law. *BellSouth*, 972 S.W.2d at 672. In other words, it is preempted. However, the courts operate under the assumption that the power of the State is not preempted "unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations omitted). Accordingly, the touchstone in all preemption arguments is the intent of Congress. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Preemption is a question of law that we review *de novo*. *Lake v. Memphis Landsmen, L.L.C.*, 405 S.W.3d 47, 55 (Tenn. Ct. App. Mar. 15, 2010).

Federal preemption of state law can occur either expressly or impliedly. Congress may explicitly preempt state law by stating so within its enactments. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (1988). However, if federal law does not expressly preempt state law, a state law may still be impliedly preempted. Implied preemption takes two forms: (1) field preemption, when Congress occupies the entire field of law on that issue, or (2) conflict preemption, when the state law actually conflicts with the federal law. *Id.* at 300. "Field preemption occurs when a state attempts to regulate conduct 'in a field that Congress intends the federal government to occupy exclusively.'" *Coker*, 2006 WL 3438082, at *5 n.8 (quoting *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1332 (Fed. Cir. 1998)). On the other hand, "conflict preemption" occurs when it is impossible to comply with both state and federal law, or when "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Schneidewind*, 485 U.S. at 300 (citations omitted). Conflict preemption is at issue in this

case. Therefore, the pertinent issue is whether it is impossible to comply with both state and federal law, or whether the state law stands as an obstacle to the accomplishment and execution of the objectives of Congress.

"In 1864, Congress enacted the NBA, establishing the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10-11 (2007). The NBA "vested in nationally chartered banks enumerated powers and 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Id.* (citing 12 U.S.C. § 24 Seventh). "To prevent inconsistent or intrusive state regulation from impairing the national system, Congress provided: 'No national bank shall be subject to any visitorial powers except as authorized by Federal law[.]'" *Id.* (citing § 484(a)). Over the years, the United States Supreme Court has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation." *Id.* (citations omitted). "Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Id.* (citing *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 290 (1896)). "However, the States can exercise no control over national banks, nor in any wise affect their operation, except in so far as Congress may see proper to permit." *Id.* (internal quotation omitted). "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Id.* at 12.

Cadence Bank argues that the NBA preempts Tennessee's statutory requirement that national banks, as corporations transacting business in Tennessee, obtain a certificate of authority. The NBA provides, in relevant part:

> Upon duly making and filing articles of association and an organization certificate a national banking association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power--
> . . . .
> **Fourth**. To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons.

12 U.S.C.A. § 24.

While apparently never decided in Tennessee, courts in other jurisdictions have concluded that the NBA preempts state statutes requiring a national bank to register or obtain a certificate of authority before transacting business in a state. *See, e.g.*, *Kennedy v. City*

*First Bank of D.C., N.A.*, 88 A.3d 142, 143-44 (D.C. 2014) (finding that the NBA preempted a statute that prevented a foreign entity from maintaining an action in the District of Columbia unless it registered to do business in the District because such a requirement infringed on national banks' ability to maintain suits "as fully as natural persons" in accordance with the NBA); *Wells Fargo Bank, N.A. v. Baker*, 204 Cal. App. 4th 1063, 1069, 139 Cal.Rptr.3d 502, 506 (Cal. Ct. App. 2012) (holding that an Iowa statute requiring a foreign corporation to hold a certificate of authority to transact business in the state was preempted by the NBA, as the statute pertained to national banks, because it infringed on the powers provided to national banks by the NBA); *770 PPR, L.L.C. v. TJCV Land Trust*, 30 So.3d 613, 616 (Fla. Ct. App. 2010) (holding that a Florida statute requiring a foreign corporation to obtain a certificate of authority prior to transacting business in the state was preempted as it applied to national banks); *Williams v. Chase Bank USA, N.A.*, 390 S.W.3d 824, 827 (Ky. Ct. App. 2012) (holding that the NBA preempted a Kentucky statute that required a national bank, as a foreign corporation transacting business in the state, to obtain a certificate of authority prior to maintaining suit in a Kentucky court, as it "significantly impair[ed]" the bank's exercise of authority under the NBA); *Indiana Nat'l Bank v. Roberts*, 326 So.2d 802, 803 (Miss. 1976) ("Unanimously, other state courts have held that a statute, similar to Mississippi's, prohibiting a foreign corporation not qualified to do business in the State from maintaining any action in any court of the State, does not apply to a national banking corporation."); *In re Hibernia Nat'l Bank*, 21 S.W.3d 908, 909-10 (Tex. Ct. App. 2000) (holding that the NBA preempted application of a Texas statute that would infringe on a national bank's federally granted right to sue in any court as fully as natural persons by requiring the bank to obtain a certificate of authority before it could maintain a suit in Texas). As these cases demonstrate, "the law is well-established that a state cannot require a national bank to register or file as a 'foreign corporation' in order to maintain a lawsuit in state court." *770 PPR*, 30 So.3d at 618. We find these opinions persuasive and likewise hold that the NBA preempts Tennessee's statute requiring a foreign corporation to obtain a certificate of authority to the extent that it pertains to national banks. The NBA permits a national bank "[t]o sue . . . in any court of law and equity, as fully as natural persons," provided it has made and filed the necessary "articles of association and an organization certificate." 12 U.S.C.A. § 24. Tennessee's certificate of authority requirement clearly infringes on that right. To use the pertinent language from the preemption analysis, "the state law stands as an obstacle to the accomplishment and execution of the objectives of Congress." *Schneidewind*, 485 U.S. at 300 (citations omitted).

In the proceedings below, Cadence Bank submitted its "Certificate of Corporate Existence" from the Comptroller of the Currency, as Administrator of National Banks, which stated that Cadence Bank "is a national banking association formed under the laws of the United States and is authorized thereunder to transact the business of banking on the date of this certificate." Accordingly, we hold that Cadence Bank is authorized to maintain this

lawsuit despite the fact that it does not have a certificate of authority from the State of Tennessee.

Our research has not revealed any cases considering whether the NBA preempts state laws requiring a national bank to maintain a registered agent and office in a state. However, the NBA preempts such requirements imposed under state law for the same reason that it preempts state laws requiring a certificate of authority. "[T]he intent naturally inferable from the NBA's language is to relieve national banks from having to meet manifold, and potentially divergent, registration requirements in the fifty states." *Kennedy*, 88 A.3d at 145. Requiring a national bank to maintain a registered agent and registered office in each state would be at least as burdensome on national banks as the certificate of authority requirement, if not more so. As noted above, the Supreme Court has repeatedly emphasized that the NBA "shields national banking from unduly burdensome and duplicative state regulation." *Watters*, 550 U.S. at 11. Therefore, we conclude that Cadence Bank was not required to maintain a registered agent and office in Tennessee due to preemption by the NBA.

For these reasons, we affirm the trial court's findings that Cadence Bank is properly doing business in the State of Tennessee, and, because of federal preemption by the NBA, Cadence Bank may maintain an action in the State of Tennessee without maintaining a registered office within the State of Tennessee, maintaining a registered agent within the State of Tennessee, or obtaining a certificate of authority from the State of Tennessee to transact business within the State as a foreign corporation.

## Summary Judgment on Remaining Counter-Claims

### *Standard of Review*

In addition to finding that Cadence Bank was properly conducting business in Tennessee, the trial court also ruled that Cadence Bank was entitled to summary judgment on Appellants' claims that Cadence Bank violated the implied duty of good faith and fair dealing and that promissory estoppel barred Cadence Bank's claim. A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is therefore *de novo* with no presumption of correctness afforded to the trial court's determination. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that all the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. *Abshure v. Methodist-Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 103 (Tenn. 2010). When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. Further, under the Tennessee Code:

In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:

      (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

      (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code. Ann. § 20-16-101(2014 Supp.) (effective on claims filed after July 1, 2011).

When reviewing the evidence, we must determine whether factual disputes exist. In evaluating the trial court's decision, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." *Mathews Partners, L.L.C. v. Lemme*, No. M2008-01036-COA-R3-CV, 2009 WL 3172134, at *3 (Tenn. Ct. App. Oct. 2, 2009) (citing *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993)). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." *Id.* "Summary Judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Landry v. S. Cumberland Amoco*, No. E2009-01354-COA-R3-CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995)).

### *Breach of Implied Duty of Good Faith and Fair Dealing*

We begin with Appellants' argument that the trial court erred in granting summary judgment on their breach of the implied duty of good faith and fair dealing claim. In its final order granting summary judgment, the trial judge ruled:

[The] allegations alleged and averred in the Counter-Complaint are without substantiating facts, and are not supported by the affidavits filed in this cause by the Defendants and Counter-Plaintiffs, nor in their depositions filed herein, and in spite of adequate investigation and query by counsel for all parties, and that there does not appear to be any real possibility that the Defendants can prove facts to substantiate either their defense to liability . . . or their claims against Cadence in their Counter-Complaint, therefore the Court finds that there are no genuine issues of material fact . . . .

-12-

Appellants claim this finding was in error. Specifically, in their brief, Appellants state that:

> It is the [Appellants]' position that Cadence Bank acted in bad faith and/or
> unfairly dealt with the [Appellants] by contradicting its statements with its lack
> of follow through and by charging the Defendants fees, i.e. accrued interest
> charges, a new balance per diem, and extra attorney fees beyond what lenders
> in the normal course of business would do. . . .  Cadence Bank further acted
> in bad faith and/or dealt unfairly with the Defendants by claiming that the real
> property at issue was somehow worth only approximately [$350,000.00], yet
> neither providing the Defendants a copy of the appraisal report upon request
> nor advising said Defendants that they would be responsible for paying for a
> copy of Cadence Bank's appraisal report.

It is well-settled in Tennessee that "'the common law imposes a duty of good faith in the performance of contracts.'" *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). The duty of good faith, however, does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract. *Wallace*, at 687. The obligation of good faith and fair dealing does not create additional contractual rights or obligations, and it cannot be used to avoid or alter the terms of an agreement. *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009).  The purpose of the implied duty is "(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." *Id.* (citations omitted).

The duty of good faith is not specifically defined by our courts. As explained in the Tennessee Practice Series:

> The term "good faith" resists an exact definition . . . because it arises in
> various contexts and its meaning will vary accordingly.  Indeed, "good faith"
> is "a term frequently defined in the negative," i.e., it represents the absence of
> bad faith. Another authority makes these helpful observations about the "good
> faith" concept:
>
> > [G]ood faith is an "excluder."  It is a phrase without general
> > meaning (or meanings) of its own and serves to exclude a wide
> > range of heterogenous forms of bad faith. In a particular context
> > the phrase takes on specific meaning, but usually this is only by
> > way of contrast with the specific form of bad faith actually or
> > hypothetically ruled out.

Notwithstanding this uncertainty over the exact nature of "good faith," parties are presumed to know the law and that the contract contains this implied duty.

The implied covenant of good faith and fair dealing is not limited to the specific contract terms but is a method of effectuating the parties' intent in unforeseen circumstances. Further, a party may violate the covenant when it interprets the contract purposely in a way to prevent the other party from performing in a timely fashion or when a party conjures up a pretended dispute with its interpretation.

21 Tenn. Prac. Contract Law & Practice § 8:33 (2014) (footnotes and internal citations omitted).

Because Cadence Bank was the moving party on the motion for summary judgment, we must first analyze whether it met its burden by showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. Regarding Appellants' claim that Cadence Bank violated the implied duty of good faith and fair dealing, the thrust of the claim arises out of their allegations that Cadence Bank improperly refused to refinance their loan pursuant to the same terms. However, it is undisputed that Cadence Bank offered to refinance the loan in written correspondence to Appellants, but Appellants took no action. Thus, the "evidence is insufficient to establish an essential element of the nonmoving party's claim" as required by Tennessee Code Annotated § 20-16-101(2). Cadence Bank also offered the only evidence in the record pertaining to the obligation to obtain an appraisal for the property at issue.

Cadence Bank points to evidence that it asserts demonstrates that Appellants are unable to show that Cadence Bank failed to refinance the debt in good faith. First, Cadence Bank submitted two letters establishing that it had, in fact, offered to refinance the loan. These two letters, dated January 18, 2012 and February 10, 2012, indicate that Cadence Bank was extending an offer to refinance the debt subject to new conditions. Notably, the offers in the letters contain a lower interest rate than the previous loan. Cadence Bank contends these letters are evidence of its willingness and its offer to refinance the loan, contrary to Appellants' argument. In the first letter, sent January 18, 2012, Mr. McKinnon wrote that he was:

pleased to inform [Appellants], that Cadence Bank has agreed to extend the matured referenced note, subject to the terms and conditions outlined below.

. . . .

Amount: $297,500 (Amount represents 85% of the appraised value of $350,000 on October 5, 2011 . . . )

Rate: 6.5% fixed (Reduction from 8.0%) . . . .

Maturity: January 2013

. . . .

Other: Borrower will be responsible for customary closing costs and appraisal fees.

The second letter, dated February 10, 2012, was sent by Cadence Bank's counsel on its behalf. The second letter repeated the terms offered in the first letter, but stated that the Bank was "willing to forbear the current matured status of the loan, and extend its due date to January 1, 2013, when all sums are due." Further, the letter provided that "if this offer is not accepted and performed within ten (10) days of the date of this letter, the bank will have no choice other than to resort to its remedies under the law." Like the first letter, the second letter included a provision stating that if Appellants "accept these new terms, you will be responsible for customary closing costs, attorney's fees and appraisal fees . . . ."

Cadence Bank indeed offered to refinance the loan. Therefore, they complied with any promise they allegedly made. Contrary to Appellants' claim that Cadence Bank refused to participate in any proposed refinancing of the debt, the letters contained in the record are specific evidence demonstrating that Cadence Bank offered to refinance the debt. Having submitted evidence demonstrating that Cadence Bank did attempt to refinance, the Bank met its burden under the statutory summary judgment standard. Accordingly, we now must consider whether Appellants met their burden to establish a material factual dispute regarding this issue.

Once the moving party has met its burden, the burden of production shifts to the nonmoving party to show that a genuine issue of material fact exists. *Byrd*, 847 S.W.2d at 215. The nonmoving party, here, Appellants, may accomplish meeting its own burden by:

(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.

*Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

As we perceive them, Appellants make two arguments: (1) that Cadence Bank violated the implied duty of good faith and fair dealing inherent in the parties' written contract by failing to refinance the debt on the previous terms; and (2) that Cadence Bank made oral promises to Appellants that constituted an oral contract to refinance the debt, which contract was subsequently breached by Cadence Bank's lack of good faith in actually going forward with the refinance as discussed. We begin with the actual language in the written contract between the parties. In its motion for summary judgment, Cadence Bank argued that Appellants "failed to point to any specific contractual provision that had been breached." A thorough review of the record indicates that Appellants pointed to no specific provision in the written contract that Cadence Bank failed to perform in good faith.

The language in the written contract clearly obligates Appellants to pay the balance due on the Note, but it does not obligate Cadence Bank to perpetually refinance the debt or forever extend the maturation date of the balloon payment. Appellants argue, however, that the Trust Secretary's Certificates authorized the Trustees to refinance the loan. Appellants submitted that the Certificates authorized the Trustees to do the following: "amend, modify, alter, extend, renew or otherwise change any of the provisions, terms, conditions, covenants, guaranties, or representations contained in any of the Loan Documents . . . ." Appellants underlined and acknowledged the foregoing language, but they failed to emphasize the final phrase that provided the Trustees could take the above actions "as the Lender may require." The above language simply does not give the Trustees any authority to unilaterally refinance or unilaterally initiate a renewal of the loan.

The written language in the contract at issue is contained in several documents; however, none of the documents in the record include a modification provision that allows either party to unilaterally renew or refinance the loan. Because there is nothing in the parties' written contract that indicates that Cadence Bank has a duty to refinance the debt, it cannot be said that Cadence Bank failed to perform its duties under the written contract by allegedly failing to refinance the debt. *See Wallace*, 938 S.W.2d at 687 ("the duty . . . does not extend beyond the agreed upon terms of the contract"). This Court cannot impose the implied duty of good faith and fair dealing in such a way as to add new obligations. *Barnes & Robinson Co. v. One Source Facility Svcs., Inc.*, 195 S.W.3d 637, 643 (Tenn. Ct. App. 2006). Further, to hold that Cadence Bank's alleged actions in failing to refinance the parties' debt were in violation of the duty of good faith and fair dealing implied in the written contract would "circumvent or alter the specific terms of the parties' agreement." *Dick Broad. Co.*, 395 S.W.3d at 665; *see also Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App.1989) (noting that without an underlying breach of contract, a breach of good faith is not an "actionable" claim); *Duke v. Browning-Ferris Indus. of*

*Tenn., Inc.*, No. W2005-00146-COA-R3-CV, 2006 WL 1491547, at *9 (Tenn. Ct. App. May 31, 2006), *perm. app. denied* (Tenn. Nov. 13, 2006) (holding that a breach of the duty of good faith is merely an element of a claim for "recognized torts, or breaches of contracts"). Accordingly, summary judgment was appropriate with respect to Appellants' claim that Cadence Bank violated the implied duty of good faith and fair dealing.

Appellants argue, however, that despite the lack of modification terms in the parties' written agreement, the parties' negotiations after the written agreements constitute either an oral modification of the contract or a new agreement upon which a breach of the duty of good faith could be found.[8] Appellants argue these oral negotiations left Appellants with the reasonable expectation that Cadence Bank would enter into a further modification of the Note. Appellants accordingly argue that they have raised a cognizable claim for breach of the implied duty of good faith with regard to the alleged oral agreement, and summary judgment should not have been granted.[9] After a thorough review of the record, we disagree.

A significant portion of Appellants' good faith and fair dealing claim is premised on their allegation that Cadence Bank breached an alleged oral promise to refinance the loan by offering different terms in its January 18, 2012 and February 10, 2012 letters. In their Response to Cadence Bank's Statement of Undisputed Facts, Appellants rely on the affidavit of David B. Uthe, which provided:

> [Mr. McKinnon] . . . made misleading statements to [David B. Uthe] **by telling [him] that it was okay for the Defendants to renew the loan with no questions asked** provided that said Defendants provide him with tax returns for the year of 2010, wherein there was neither any follow up by said Mr. McKinnon nor was the loan renewal and/or refinance being processed . . .

---

[8]Neither party points to any provision in the Note or other underlying agreements that prohibits the parties from entering into subsequent oral agreements regarding extending the maturity date of the Note or refinancing the debt.

[9]Generally, parol evidence is inadmissible to contradict, vary, or alter a written contract when the written instrument is valid, complete, and unambiguous, except in cases where fraud or mistake is alleged. Tenn. Code Ann. § 47-2-202. However, evidence of a subsequent agreement, such as alleged here, after the execution of the written agreement, is not barred by the parol evidence rule. *Schwartz v. Diagnostix Network Alliance, LLC*, No. M2014-00006-COA-R3-CV, 2014 WL 6453676 (Tenn. Ct. App. 2014) (citing *Brunson v. Gladish*, 125 S.W.2d 144, 147 (Tenn. 1939); *Univ. Corp. v. Wring*, No. W2011-01126-COA-R3-CV, 2012 WL 4078517, at *6 (Tenn. Ct. App. Sept. 18, 2012)). Accordingly, a written contract may be altered by the express words of the parties after the contract is made. *Schwartz*, 2013 WL 6453676, at *10; *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611 (Tenn. Ct. App. 2011).

(Emphasis added.) Appellants argue that the allegations of statements made by Cadence Bank representatives, including Mr. McKinnon, create a dispute of material fact.

"The determination of whether a contract has been formed is a question of law." *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009) (citations omitted). Taking the evidence in the light most favorable to the nonmoving party, summary judgment was appropriate. We recognize that David Uthe testified, by Affidavit, that Mr. McKinnon "made misleading statements to [him] by telling [him] that it was okay for the Defendants to renew the loan with no questions asked provided that said Defendants provide him with tax returns for the year of 2010, wherein there was neither any follow up by said Mr. McKinnon nor was the loan renewal and/or refinance being processed." However, David Uthe also testified in his deposition that Mr. McKinnon suggested in 2011 that they extend the note for six months and that Cadence Bank would "look to renew it." Uthe also testified that Mr. McKinnon told him "[y]our rates will go down, rates are down since the time you had this one in 2006."

The record is clear that the Trustees executed the original promissory note on April 4, 2001, for $476,000.00, payable in fifty-nine (59) installments of $4,097.00 per month at 8.25 percent interest. The parties executed a Modification Agreement on May 10, 2006, refinancing a balance of $423,220.70 to be paid in fifty-nine (59) installments of $4,073.79, but at 8.00 percent interest. The Modification Agreement matured on April 10, 2011. Between January 2011 and June 2011, Cadence Bank sent numerous letters to the Trustees, all of which are contained in the record. Those letters indicate that Mr. McKinnon requested additional information before "submitting [the loan] for approval," "consider[ing] renewal," and "reviewing [the] loan." Finally, on June 24, 2011, the parties entered into a Change in Terms Agreement, which provided that "borrower will pay this loan [with a principal amount of $331,057.20] in 2 regular payments of $4,073.49 each and one irregular last payment of $328,596.14." The Change in Terms Agreement matured on September 10, 2011.

In order to analyze whether Cadence Bank breached the implied duty of good faith and fair dealing, we must first determine whether there was, in fact, any oral contract between the parties. "[A] claim based on the implied covenant of good faith and fair dealing is not a stand alone claim; rather, it is part of an overall breach of contract claim." *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 907 (Tenn. Ct. App. 2009) (citing *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. CT. App. 2000)). "The determination of whether a contract has been formed is a question of law." *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009).

Appellants contend that there is a dispute of fact as to whether any oral promises were made and/or breached. However, taking the facts in the light most favorable to the Appellants, as we are required to do when reviewing summary judgment, we are still unable

to find that a contract was formed. Appellants rely on Uthe's Affidavit testimony that "it was okay for the [Appellants] to renew the loan with no questions asked," alleging that this testimony creates an issue of fact precluding summary judgment. However, the remainder of Uthe's Affidavit states the renewal would be forthcoming "provided that said [Appellants] provide [Mr. McKinnon] with tax returns for the year of 2010."

To be enforceable, a contract must result from a meeting of the minds, be based on sufficient consideration, and be sufficiently definite. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id*. at 553-554 (citing Restatement (2d) Contracts, § 33 (1981)). When a term is left open for future negotiation, there is nothing more than an unenforceable agreement to agree. *See Four Eights, L.L.C. v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005). "It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." *Id.* at 487 (quoting *United Am. Bank of Memphis v. Walker*, 1986 WL 11250 (Tenn. Ct. App. 1986) (quoting *King v. Dalton Motors, Inc.* 109 N.W.2d 51 (Minn. 1961))).

As noted above, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (citations omitted). In this case, Appellants present no evidence whatsoever to establish the basic elements of a contract. While David Uthe does assert that Mr. McKinnon told him that Appellants could "renew the loan with no questions asked," there is no evidence in the record to establish the actual terms of the alleged oral contract. The principal balance, interest rates, and payment amount had changed between the parties' 2001 Promissory Note and the 2006 Modification Agreement. The principal balance changed from 2001 to 2006 and then again between the 2006 Modification Agreement and the 2011 Change in Terms Agreement, as did the number of payments to be made (59 installments to be made under the 2006 Modification Agreement, compared to two regular payments and one irregular payment under the 2011 Change in Terms Agreement). Uthe testified that Mr. McKinnon told him in 2011 that "your rates will go down, rates are down since the time you had this one in 2006." However, Appellants offer no evidence to suggest any certainty in the interest rate Mr. McKinnon allegedly promised for a renewal of the full loan balance. Appellants also offer no evidence to suggest any certainty in the term of the loan renewal or the principal amount to be financed. Without evidence regarding the specific terms of an alleged oral agreement, we cannot find, as a matter of law, that a contract was formed.

Without a contract, Appellants cannot sustain a claim for breach of the implied duty of good faith and fair dealing. For that reason, we affirm the trial court's grant of summary judgment.

**Promissory Estoppel**

We likewise affirm the trial court's grant of summary judgment on Appellants' claim of detrimental reliance. Promissory estoppel is also referred to in Tennessee case law as "'detrimental reliance' because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment." *Calabro v. Calabro*, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999) (citations omitted). Again viewing the evidence in the light most favorable to Appellants, the promise upon which they claim they relied was ambiguous and unenforceably vague. *See Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991). As discussed above, the promise Mr. McKinnon allegedly made was too indefinite to provide a basis for relief. Therefore, we affirm summary judgment on Appellants' promissory estoppel claim.

**Conclusion**

The judgment of the Chancery Court of Shelby County is affirmed as to the authority of Cadence Bank, N.A., to bring this lawsuit in Tennessee and affirmed with respect to the dismissal of Appellants' counter-claims. This cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to the Appellants The Alpha Trust, The M.S.U. Family Trust, The D.S.U. Family Trust, Marvin V. Uthe, Shirley A. Uthe, and Sandra L. Uthe, and David B. Uthe in his capacity as trustee, and their surety, for all of which execution may issue, if necessary.

_____
BRANDON O. GIBSON, JUDGE