IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2020 Session

## LOANS YES v. KROGER LIMITED PARTNERSHIP I ET AL.

**Appeal from the Circuit Court for Rutherford County**
**No. 73977       Barry R. Tidwell, Judge**

_____

### No. M2019-01506-COA-R3-CV

_____

A commercial tenant stopped paying rent on leased space six months before the end of its five-year term. The landlord was unsuccessful in its attempts to find a replacement tenant and sued the tenant for breach of contract. The trial court found in favor of the landlord and awarded it damages, including unpaid rent, late fees, prejudgment interest, and attorney's fees. The tenant appealed. Other than a change in the amount of late fees awarded and instructions regarding recalculating the prejudgment interest, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Modified in Part, and Remanded**

ANDY D. BENNETT, J.,[1] delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., joined. RICHARD H. DINKINS, J., not participating.

Linda Nicklos, LaVergne, Tennessee, for the appellant, Loans Yes.

Nicholas Lloyd Vescovo, Memphis, Tennessee, for the appellee, Kroger Limited Partnership I.

### OPINION

I. FACTUAL BACKGROUND

Loans Yes ("Tenant") rented commercial space in a strip mall located in LaVergne, Tennessee from Kroger Limited Partnership I ("Landlord") for a five-year term beginning in May 2008. The five-year term ended on April 30, 2013, and the parties extended the lease for an additional five-year period that was to end on April 30, 2018. The parties

_____

[1] This case was transferred to the judge on September 15, 2020.

executed a lease extension agreement for the second five-year term and ratified and affirmed the provisions set forth in the initial lease. Tenant's rent for the first year of the extension period started at $1,750 per month. Each year thereafter, the monthly rent increased by $50, with the result that Tenant's rent was $1,900 per month for the year May 1, 2016-April 30, 2017, and it was $1,950 per month for the year May 1, 2017-April 30, 2018.

In January 2017, Tenant informed Landlord's regional property manager that it wanted to terminate its lease early. Landlord agreed to have its broker, Colliers International ("Broker"), market Tenant's space in an effort to find another tenant. On February 3, 2017, Landlord, Tenant, and Broker executed a broker's agreement whereby Broker agreed to "use its best efforts to lease the Premises to tenants whom Landlord, in its sole and absolute discretion, shall be deemed desirable and upon such terms and conditions as shall be acceptable to Landlord."

Ryan Widenhofer was employed by Broker, and he testified about steps he took to find a replacement tenant for Tenant's space. In addition to placing a four-foot by eight-foot sign near Murfreesboro Pike, where the strip mall was located, to advertise the availability of property, Mr. Widenhofer testified that he took the following steps to find a replacement tenant for Tenant's space:

> Well, shortly after this [broker's] agreement was in place, I pulled together an initial marketing e-mail. We called it an e-mail blast, and that went out to, I think, approximately 335 retail brokers. You know, within the, you know, Nashville MSA.[2] It's kind [of] an initial step that we take to let the real estate community know that, you know, we have available space here. And then in addition to that, we also listed the space for lease on the Colliers website. And then I also had it listed on two other websites, CoStar.com and LoopNet.com, which are kind of commercial multiple-listing websites that prospective tenants and other brokers, you know, frequently search when they're looking for property.
>
> . . . .
>
> And in addition to these three websites that we had the space on, we also had a showing on our availabilities report that my office sends out to our database. And that actually comprises of approximately 500 plus brokers. In addition to the retail brokers, the office brokers, and industrial brokers are also included in that e-mail blast, and that goes out around the first of every month.

---

[2]An MSA is a metropolitan statistical area.

In late May or early June 2017, a commercial real estate broker contacted Mr. Widenhofer to let him know that his client, Naser Ghaly, was interested in opening a Greek restaurant in the strip mall. Mr. Ghaly expressed interest in moving into Tenant's space, and on June 9, 2017, Mr. Widenhofer e-mailed Mr. Ghaly a tenant application. Mr. Ghaly's broker e-mailed the completed application back to Mr. Widenhofer on July 17. Mr. Widenhofer forwarded the completed application to Landlord the same day he received it. Mr. Widenhofer prepared a letter of intent and sent it to Landlord for approval on September 5, 2017. On September 18, Mr. Widenhofer e-mailed the letter of intent, which included a ten-year term, to Mr. Ghaly's broker and informed him that "[o]nce we agree on the LOI, we will then draft a Lease incorporating the agreed upon terms." Mr. Ghaly changed the rental term from ten years to five years. He then signed the letter of intent on September 25, 2017, and his broker e-mailed this document back to Mr. Widenhofer. Mr. Widenhofer forwarded the executed letter of intent to Landlord two days later.

Landlord's property manager informed Tenant by e-mail in early October that Tenant would have to "finalize any outstanding rents and finalize the 2017 reconciliations . . . along with any commissions due to the leasing agent" before a lease with Mr. Ghaly could be finalized. Mr. Widenhofer prepared a draft lease and sent it to Mr. Ghaly's broker on October 16. On October 20, Landlord's regional property manager again informed Tenant by e-mail that Landlord would not sign a lease with Mr. Ghaly until Tenant's account was "brought into a current status relating to the rent." The property manager wrote:

> I have sent you several e-mails regarding this issue and the account still remains in a delinquent status. A statement is attached. The current balance, excluding late fees is $4,026.53. Late fees in the amount of $402.65 will be added to the account, making the total balance due through October 2017 rent $4,429.18. This balance needs to be paid immediately.

> Please note that you will also owe for a reconciliation of the 2017 CAM/TAX/INS[3] expenses. These will be sent to you upon an estimated date for the Lease to commence with Naser. This amount, if any is due, will have to be paid prior to the Landlord executing the Lease with Naser. There will also be the commission that is due to Woody that will have to be paid.

On November 22, 2017, Mr. Ghaly signed the draft lease that Mr. Widenhofer sent to Mr. Ghaly's broker, and Mr. Widenhofer forwarded the executed lease to Landlord. Before Landlord had a chance to sign the lease, however, Mr. Ghaly informed Mr. Widenhofer that he had changed his mind and wanted to "cancel [his] application." According to Mr. Ghaly, the City of LaVergne was requiring him to spend between

---

[3]"CAM/TAX/INS" refers to common area maintenance, tax, and real estate taxes that Tenant was responsible for paying under its lease with Landlord.

$15,000 and $20,000 to install a grease trap if he wanted to operate a restaurant in Tenant's space. Mr. Ghaly ended up finding another location for his restaurant that was less expensive to rent.

Tenant vacated the rented space in July 2017. It paid rent through October 2017. Once Mr. Widenhofer began marketing the space in February 2017, he did not stop marketing it until another tenant was installed, which was after Tenant's lease ended on April 30, 2018.

## II. PROCEDURAL BACKGROUND

Tenant filed suit against Landlord in general sessions court on December 6, 2017, seeking damages of $24,999 based on Landlord's failure to mitigate its damages by finding a replacement tenant after Tenant vacated the premises in July 2017. Landlord filed a counterclaim for breach of contract and requested that the case be removed to circuit court.

Tenant filed an amended complaint in circuit court, seeking damages equal to the amount of nine months' rent it paid due to Landlord's "willful failure to mitigate its damages, as well as punitive damages, and attorney's fees."[4] Landlord moved to dismiss Tenant's amended complaint for failure to state a claim, arguing that Tenant's asserted cause of action against Landlord was an affirmative defense rather than a cause of action. Landlord then filed an answer and counterclaim, asserting breach of contract against Tenant. Landlord sought as damages unpaid rent, late fees, and its attorney's fees. Landlord also sought an award of pre- and post-judgment interest to the extent allowed under the parties' lease agreement and the law. Tenant filed a second amended complaint against Landlord, changing its cause of action from mitigation of damages to breach of contract. The trial court denied Landlord's initial motion to dismiss.

Landlord then moved to dismiss Tenant's second amended complaint, again arguing that Tenant failed to state a claim for which relief could be granted. The trial court granted Landlord's motion to dismiss Tenant's second amended complaint with prejudice. Tenant did not appeal the trial court's dismissal of its second amended complaint.

Once Tenant's second amended complaint was dismissed, the only claim left to adjudicate was Landlord's counterclaim for breach of contract. Tenant moved for partial summary judgment on the issues of bad faith and failure to mitigate damages. Tenant also moved to dismiss Landlord's counterclaim, arguing that Landlord could not use an acceleration clause to sue for rent payments that were not yet due. After the term of Tenant's lease ended, and once all of the rental payments Landlord was seeking had become due, the trial court denied Tenant's motion to dismiss Landlord's counterclaim.

---

[4]Tenant also asserted claims against Broker. Broker is not a party to this appeal, however, so we will not address Tenant's claims against Broker.

The court also denied Tenant's motion for partial summary judgment, finding genuine issues of material fact existed as to Landlord's good faith attempts to mitigate its damages related to Tenant's alleged breach of the lease agreement.

Landlord's claim against Tenant was tried on November 27, 2018. The trial court issued a final order on January 29, 2019, finding in favor of Landlord. The court found that Tenant, Landlord, and Broker all agreed in the broker agreement that "Broker and Landlord are not obligated to lease the Premises prior to the Tenant's existing term expiration date of April 30, 2018 under the Retail Lease dated May 6, 2008." The court further found that Tenant acknowledged in the broker agreement that (1) Tenant was "responsible for all rents and other charges payable under the Lease until such time as the Lease expires or Landlord and Broker secure a new tenant"; (2) any prospective tenant "must meet the Landlord's financial requirements and the acceptance of a tenant is at Landlord's sole and absolute discretion"; and (3) Tenant was required to "be in compliance with all Lease terms and conditions along with all monetary obligations being paid in accordance with the Lease prior to the Landlord signing a new lease." The court ruled against Tenant's assertions that Landlord failed to mitigate its damages and/or lacked good faith and fair dealing. The court awarded Landlord $23,887.29 in damages and $22,585.50 in attorney's fees and costs.

Tenant filed a Rule 59 motion to alter or amend the judgment in an effort to reduce both the damages and the attorney's fee awards. The trial court reduced the damages award by $1,550 to account for Tenant's security deposit, but it denied Tenant's other requests to reduce its award of damages. The court set another hearing for a final determination of the award of attorney's fees. Following that hearing, the court increased its award to Landlord of attorney's fees to $26,390.48. Tenant appeals, challenging the trial court's determination that Landlord was not liable for failing to mitigate damages and its award of damages and attorney's fees.

III. ANALYSIS

A. Mitigation of Damages

Tenant contends the trial court erred by failing to find that Landlord acted unreasonably in attempting to mitigate its damages after Tenant informed Landlord that it wanted to terminate the lease early. In a bench trial such as this, we review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." TENN. R. APP. P. 13(d); *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 777 (Tenn. Ct. App. 2010). We review questions of law de novo, with no accompanying presumption of correctness. *Blair v. Brownson*, 197 S.W.3d 681, 683 (Tenn. 2006). This case involves the construction of a lease, which is a contract between the parties. We review issues of

contract interpretation de novo. *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 80 (Tenn. 2012).

The principles and guidelines of contract interpretation are well-established and include the following:

> "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand* [*v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)] (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). We initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)). The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630. However, if the terms are ambiguous in that they are "susceptible to more than one reasonable interpretation," *Watson*, 195 S.W.3d at 611, we must apply other established rules of construction to aid in determining the contracting parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). The meaning of the contract becomes a question of fact only if an ambiguity remains after we have applied the appropriate rules of construction. *Id.*

*Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). Neither party here argues the lease at issue contains ambiguous terms; thus, we have no need to look outside the four corners of the contract to interpret its meaning. Moreover, contracts in Tennessee include an implicit obligation by the parties to act in good faith and use fair dealing in performing and enforcing their contracts. *Dick Broad. Co.*, 395 S.W.3d at 660 (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). However, "[t]he obligation of good faith and fair dealing does not create additional contractual rights or obligations, and it cannot be used to avoid or alter the terms of an agreement." *Cadence Bank, N.A. v. The Alpha Trust*, 473 S.W.3d 756, 769 (Tenn. Ct. App. 2015) (citing *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)). The purpose behind this implied obligation is "'(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered.'" *Id.* (quoting *Lamar Adver. Co.*, 313 S.W.3d at 791).

This court addressed a tenant's breach of a lease and the landlord's entitlement to damages in the case *Kahn v. Penczner*, No. W2006-02527-COA-R3-CV, 2008 WL 2894827 (Tenn. Ct. App. July 24, 2008), where we wrote:

It is well settled that the measure and elements of damages upon the breach of a lease is governed by the general principles that determine the measure of damages on claims arising from breaches of other kinds of contracts. The general rule of contracts, to the effect that the plaintiff may recover damages only to the extent of its injury, applies to leases. Damages for breach of a lease should, as a general rule, reflect a compensation reasonably determined to place the injured party in the same position as he or she would have been in had the breach not occurred and the contract been fully performed, taking into account, however, the duty to mitigate damages. In addition, damages resulting from a breach of a lease must have been within a contemplation of the parties; must have been proximately caused by the breach; and must be ascertainable with reasonable certainty without resort to speculation or conjecture.

*Kahn*, 2008 WL 2894827, at \*4 (citing 49 AM. JUR. 2D *Landlord & Tenant* § 96 (2003)). When a tenant abandons rental property, the landlord "is required to mitigate the damages suffered," *Bellevue Props., LLC v. United Retail Inc.*, No. M1999-01480-COA-R3-CV, 1999 WL 1086221, at \*2 (Tenn. Ct. App. Dec. 3, 1999) (citing *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991)), by doing "'what is fair and reasonable under the circumstances to reduce [the landlord's] damages,'" *id.* (quoting *Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 333 (Tenn. Ct. App. 1987)). *See also Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 353 (Tenn. Ct. App. 2007) (stating that party injured by another's breach of contract must "'exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage'") (quoting *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971)). The breaching party carries the burden of proving the landlord failed to mitigate its damages. *Bellevue Props.*, 1999 WL 1086221, at \*2 (citing *Hailey v. Cunningham,* 654 S.W.2d 392, 396 (Tenn. 1983)).

In ruling against Tenant's assertions that Landlord failed to mitigate its damages and/or lacked good faith and fair dealing, the trial court made the following findings of fact:

A commercial real estate broker for Colliers, Mr. Woody Widenhofer, was the leasing agent responsible for reletting the unit space. Mr. Widenhofer sent marketing emails about the unit space to approximately 335 retail brokers and listed the space's availability on several websites. Mr. Widenhofer also listed the unit space on Colliers' availabilities report, which is sent to over 500 other commercial real estate brokers. Additionally, Mr. Widenhofer advertised the unit's availability on a large sign near the road in front of the shopping center. When asked why he did not display a "for rent" sign in the window of the unit space, Mr. Widenhofer testified that in his

experience a sign in the window could deter customers or otherwise be bad for businesses still operating.

In May of 2017 a potential tenant named Naser Ghaly made contact with Mr. Widenhofer through his real estate broker, Sammy Said, about the unit space. Mr. Ghaly was interested in opening a Greek restaurant there. On June 9th, 2017, Mr. Widenhofer sent a tenant application to Mr. Said for Mr. Ghaly via e-mail, and on July 17th, 2017, Mr. Widenhofer received Mr. Ghaly's completed application back and sent it to Kroger for its approval. On September 5th, 2017, Mr. Widenhofer sent a Letter of Intent to Kroger communicating that they should "move forward" with the Greek restaurant for the Loans Yes unit space. While awaiting approval from Kroger, Mr. Widenhofer continued to market the Loans Yes unit space through the e-mail blasts, availability reports, and the sign near the road in front of the shopping center. On September 18th, 2017, Mr. Widenhofer received approval from Kroger and e-mailed a Letter of Intent to rent the premises to Mr. Ghaly and Mr. Said. On September 25th, 2017, Mr. Said sent Colliers the Letter of Intent signed by Mr. Ghaly. On September 28th, 2017, Kroger communicated to Mr. Widenhofer that he should move forward with drafting a lease for Mr. Ghaly and the Loans Yes space. On October 4th, 2017, Mr. Widenhofer sent a draft lease to Kroger. On October 25th, 2017, Mr. Widenhofer confirmed with Kroger that Kroger must settle any past due rent from Loans Yes before entering a new lease with Mr. Ghaly. Loans Yes ceased making rent payments in November of 2017.

After Loans Yes ceased payment, on November 9th, 2017, Kroger continued to move forward in pursuit of reletting the unit space by e-mailing Mr. Widenhofer the draft lease with requested revisions to be made. Mr. Widenhofer and Kroger completed these revisions within a week, by November 16th, 2017. On November 17th, 2017, Ms. Nicklos, on behalf of Loans Yes, filed a General Sessions Civil Warrant against Kroger.

On November 21st, 2017, Kroger e-mailed an approved lease form to Mr. Widenhofer to obtain Mr. Ghaly's signature, and Mr. Ghaly signed the lease the next day. Mr. Ghaly's lease for the Loans Yes unit space provided for a monthly rent of $1,950.00, which was the same monthly rent amount Loans Yes agreed to. However, on December 6th, 2017, Mr. Said informed Mr. Widenhofer that Mr. Ghaly was canceling the lease, and Mr. Widenhofer informed Kroger of the same. Mr. Ghaly testified that he did not want to move forward with the lease of the Loans Yes unit space because putting a restaurant in that space would require a grease trap that was too expensive and he found a cheaper location elsewhere for his restaurant. During this time, the advertising sign in front of the shopping center remained and Mr.

Widenhofer continued to send e-mail blasts and availability reports about the unit space. Mr. Widenhofer spoke with other potential tenants in February and March of 2018; however, these potential tenants did not submit applications. On March 5th, 2018, Mr. Widenhofer sent a tenant application to a new potential tenant, Mr. Hassan. After submitting his application and being approved by Kroger, Mr. Hassan entered into a lease to rent the Loans Yes unit space on July 10th, [2018] at a monthly rent rate of $1,900.00 for the first year's term.

The time period when Mr. Widenhofer began negotiating with Mr. Ghaly was from May of 2017 until he signed the lease on November 22nd, 2017, totaling six (6) months. Comparatively, the time period when Mr. Widenhofer began negotiating with Mr. Hassan was from March 5th, 2018 until July 10th, 2018 when he signed the lease, totaling four (4) months. Mr. Widenhofer stated that in his experience as a commercial real estate broker the negotiation process when drafting a lease can take anywhere from two (2) to nine (9) months. Accordingly, based on the proof at trial, the arguments of the parties, and all applicable legal authority, the Court finds that Kroger and Colliers acted reasonably in the mitigation of their damages, and specifically did not engage in alleged improper conduct related to the advertising of the Loans Yes unit space.

Tenant argues Landlord took too long to prepare the necessary documents once Landlord approved Mr. Ghaly as a replacement tenant. However, the parties' broker agreement provided that "Tenant must be in compliance with all Lease terms and conditions along with all monetary obligations being paid in accordance with the Lease prior to the Landlord signing a new Lease," and an e-mail from Landlord's regional property manager informed Tenant by e-mail on October 20, 2017, that Tenant had an outstanding balance of $4,026.53, excluding late fees. The property manager was clear in her e-mail to Tenant that "a Lease with Nasser [sic] will not be signed until your account is brought into a current status relating to the rent." Thus, if there was a delay in Landlord's preparation of documents for Mr. Ghaly during the month of October, the trial court could have properly found that Tenant was the cause of the delay.

The parties' lease required Tenant to obtain Landlord's consent before Tenant could assign or sublet its space. Tenant contends that Landlord withheld its consent to re-let the space and that Landlord's withholding of consent was unreasonable. Tenant has failed to show, however, that Landlord withheld its consent from re-letting the space to any tenant ready and willing either to take over Tenant's lease or enter into a new lease with Landlord. Tenant introduced no evidence showing that anyone other than Mr. Ghaly was interested in renting Tenant's unit during the relevant time period. As Mr. Widenhofer testified, and as the e-mails reflect, Landlord accepted Mr. Ghaly as a prospective tenant and was prepared to sign a lease with him. Under the proposed lease, Mr. Ghaly would have paid

the same rate that Tenant was then paying, $1,950 per month, for the first year, with incremental increases each year thereafter. Mr. Ghaly changed his mind about renting Tenant's unit after signing the lease, but Tenant did not establish that this change of mind was due to anything Landlord did or did not do. Instead, Mr. Ghaly testified that he did not want to pay the $15,000-$20,000 cost of installing a grease trap that the City of LaVergne would have required if he opened a restaurant in Tenant's space.

Tenant contends it found a subtenant in July 2017 who was interested in taking over the space and that Landlord unreasonably "withheld consent or failed to respond at all." The record includes an e-mail from Tenant dated July 19, 2017, addressed to the regional property manager, informing her that it had "found a subtenant who wants to move in immediately" and asking whether it should forward the potential sub-tenant's information to Mr. Widenhofer. The property manager responded later that day and told Tenant it could send the information to Mr. Widenhofer and "he will get with them on what is needed." The subtenant Tenant was referring to was Mr. Ghaly, with whom Mr. Widenhofer had been communicating since May or June, either directly or through Mr. Ghaly's real estate agent.[5]

Tenant had less than a year left on its five-year lease by the time Mr. Ghaly expressed interest in the space, and Tenant asked Landlord on September 18, 2017, for "assurance" that it would not "kick [Mr. Ghaly] out" of the space once the six months left on Tenant's lease expired. Contrary to its argument that Mr. Ghaly wanted to sublet the space from Tenant, Tenant presented no evidence that Mr. Ghaly was interested in subletting Tenant's space for just six months or that Landlord objected to any attempt by Tenant to sublet its space. Mr. Ghaly testified that he was interested in a two-year lease "to experiment to see if the restaurant would work" in that location, with the option to lease the space for a longer term thereafter. According to Mr. Widenhofer, Landlord did not usually negotiate two-year terms with new tenants. The record shows that Mr. Widenhofer worked with Mr. Ghaly, Mr. Ghaly's real estate agent, and Landlord to create a letter of intent and draft lease starting in May or June and extending until November 2017. After signing the lease in November, however, Mr. Ghaly changed his mind and decided to rent space elsewhere.

Mr. Widenhofer continued marketing Tenant's space after Mr. Ghaly withdrew from negotiations and worked with two other potential tenants in an effort to rent the space before Tenant's five-year term ended on April 30, 2018. One of these interested parties eventually moved into Tenant's space, but not before Tenant's term ended. Based on Mr. Widenhofer's testimony, the trial court found that it was not unreasonable to spend up to nine months negotiating a commercial lease. Mr. Widenhofer and Landlord negotiated a

---

[5]Despite Tenant's statement that Mr. Ghaly was ready to move in "immediately," Mr. Ghaly testified that he would not have been able to move in and open a restaurant in Tenant's space until he met with the City of LaVergne and knew the steps he would have been required to take to operate a restaurant there.

- 10 -

lease with Mr. Ghaly in less than nine months, and Tenant has not shown that Landlord was to blame for Mr. Ghaly's decision to back out of the deal. Tenant was anxious to find someone to take over its space before its lease terminated on April 30, 2018. However, the evidence does not preponderate against the trial court's determination that Tenant failed to prove that Landlord violated its obligation of good faith or fair dealing or was unreasonable in its attempts to mitigate damages by finding a replacement tenant before Tenant's five-year term ended.

B. Calculation of Damages, Interest, and Attorney's Fees

1. Damages and Interest

Tenant contests the damages, interest, and attorney's fees the trial court awarded Landlord. We review a trial court's award of damages and prejudgment interest under an abuse of discretion standard. *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 826 (Tenn. Ct. App. 2012) (citing *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Although the abuse of discretion standard does not permit an appellate court to substitute its discretion for that of the trial court, it does not "immunize" a trial court's discretionary decision from "meaningful appellate scrutiny." *Id.*; *see also Edmunds*, 403 S.W.3d at 826.

The parties' lease contained a section entitled "Events of Default," which included as an event of default Tenant's "fail[ure] to pay when due any payment obligation, or any portion thereof, owing to Landlord or to Landlord's agent." Upon an event of default by Tenant, the lease stated:

> [I]t is stipulated and agreed that Tenant shall remain liable to Landlord for damages for breach of this Lease and of Tenant's covenants hereunder in an amount equal to the total of the following:
>
> (a) All fixed minimum rent, percentage rent, if applicable, additional rent, Common Facility charges, late Charges, additional rent payable for taxes and otherwise, and any and all other charges payable by Tenant hereunder or under other agreements with the Landlord due for the period prior to the date of termination of this Lease or reentry but unpaid, together with interest and additional late charges from due date until paid; PLUS

(b)  All costs and expenses incurred by Landlord in connection with reentry and repossession of the Leased Premises, . . . and any broker's commissions, attorneys' fees, and other charges incurred in connection therewith or in connection with reletting the Leased Premises, including attorney's fees, expended in the collection of all Rents; PLUS

(c)  A sum equal to all Rents which would have been payable hereunder after the date of termination or reentry for the balance of the Term of the Lease had the Lease not been terminated . . . .

Following the presentation of evidence, the trial court entered judgment for Landlord and awarded it $23,887.29 in damages, writing:

Loans Yes is in default and breach of the Lease for non-payment of rent for the months of November 2017, December 2017, January 2018, February 2018, March 2018, and April 2018, totaling $11,700.00. The proof at trial supported that common area maintenance fees, taxes, and insurance costs are commonly taxed onto the monthly rent obligation in commercial lease agreements, and this Lease is consistent with such. Accordingly, Loans Yes owes for the common area maintenance fees, taxes, and insurance costs accompanying the six (6) months that remained on the Lease through April 2018, totaling $2,364.00. Additionally, the common area maintenance fees, taxes, and insurance are estimates that are reconciled at the end of the year; Loans Yes owes for the 2017 reconciliation of these additional rent obligations, totaling $372.95. The cumulative late fees are addressed in Section 3.8 of the Lease Agreement and, concurrent with Loans Yes' debt for non-payment of rent, Loans Yes owes ten percent (10%) cumulatively per month for each month Loans Yes failed to pay rent under the Lease and Lease Extension Agreements. Accordingly, Loans Yes owes late fees in the total amount of $6,077.72 for the months of November 2017 through April 2018. Interest charges have also been accruing since Loans Yes' last payment on October 30th, 2017, such that the amount of interest owed on past due rent, additional rent, and late fees totals $3,372.63.

Although Tenant disagrees with the trial court's determination that Landlord did not fail to mitigate its damages once Tenant informed Landlord that Tenant wanted to terminate its lease early, Tenant does not challenge the trial court's award to Landlord of the monthly rental amount of $1,950 or the CAM/TAX/INS monthly estimates, which the parties' lease refers to as "additional rent," for the months November 2017 through April 2018.  Tenant objects, however, to the trial court's award of $372.95 for the 2017 reconciliation of additional rent.  Landlord's property manager testified that Tenant paid a monthly amount for CAM/TAX/INS that was just an estimate of the actual amount owed.  She explained:

At the end of each year, once the annual charges are determined for those - - for the common area maintenance fees, insurance, and real estate taxes, a reconciliation is done. The reconciliation is based on the tenant's square footage divided by the square footage of the shopping center. So they pay a pro rata share, those costs. Once that cost is determined what the actual amount is, then the monthly estimates/escrows are deducted, and either the tenant will owe or an amount will be given back to the tenant as a credit through rents.

Following the trial, Landlord filed a ledger with the court detailing the damages it claimed were owing from Tenant. The ledger covered the period from January 1, 2017, through April 30, 2018. It detailed the amounts Tenant owed each month and included Tenant's payments and resulting balance, month by month. Tenant owed Landlord a total of $2,344 per month for the last year of its lease, which consisted of rent ($1,950), estimated common area fees ($200), estimated real estate taxes ($155), and estimated insurance ($39).[6] The ledger included a reconciliation for the year 2017 in the amount of $372.95, which is the amount the court awarded Landlord for the 2017 reconciliation. Landlord did not include a reconciliation for the four months of 2018 that Tenant's lease covered, and the court did not award Landlord a reconciliation amount for the 2018 year. Because the record supports the trial court's award of $372.95 for the 2017-year reconciliation of CAM/TAX/INS and Tenant fails to show the trial court erred in adopting this figure, we affirm this part of the court's award.

Tenant next challenges the late fees the trial court awarded Landlord. In a section called "Rent Delinquencies," the parties' lease addressed late fees as follows:

> Should the Tenant for any reason whatsoever, fail to pay, when the same is due and payable, any "Minimum Rent" and/or "Additional Rent" and should said rent not be paid within five (5) days of due date, Tenant shall pay a **late penalty equal to ten percent (10%) of total rents due**.

(Emphasis added.) "Minimum rent" is defined as the fixed monthly rate, which was $1,950 for the period at issue. "Additional rent," as discussed above, is the estimated monthly fee for the CAM/TAX/INS, which totaled $394 for this same time period. The trial court awarded Landlord late fees in the amount of $6,077.72, a figure which we believe is incorrect. The trial court referred to the late fees as "cumulative," a term that does not appear in this section of the lease. Instead, the lease provides that late fees are to apply to the "total rents due." It is not clear how the trial court arrived at the $6,077.72 figure, but Tenant may be correct in describing the trial court's calculation of these fees as "late fees on late fees." Our calculations show that Tenant's liability for late fees under the lease is

---

[6]The trial court erroneously calculated Tenant's monthly obligation to be $2,364 rather than $2,344, which was the correct amount.

$4,922.40.  This number represents ten percent of the total amount of rent that was due each month during the six months at issue, when Tenant was in default under the lease, not ten percent of the cumulative amount, which would improperly include the late fee from the prior month in the ten percent calculation.  We arrive at the correct amount of late fees Tenant owes thusly:

| Month | Running Tally of Rent Due | Late Fees |
|---|---|---|
| November 2017 | $2,344 | $234.40 |
| December 2017 | $4,688 | $468.80 |
| January 2018 | $7,032 | $703.20 |
| February 2018 | $9,376 | $937.60 |
| March 2018 | $11,720 | $1,172.00 |
| April 2018 | $14,064 | $1,406.40 |
| Total Late Fees Owing: | | $4,922.40. |

Tenant next challenges the trial court's award of prejudgment interest.  The trial court awarded Landlord $3,372.63 in interest on Tenant's past due rent, but it does not explain how it arrived at this number or what rate of interest it used to reach this figure. The parties' lease provided for the payment of interest in the section titled "Rent Delinquencies":

> In addition [to the payment of late fees], all unpaid rents shall bear interest from the date due to the date of payment at the rate of eighteen percent (18%) per annum in excess of the prime rate as quoted by U.S. Bank, N.A., **or the highest rate permitted by law, whichever is less**.

(Emphasis added.)

An award of prejudgment interest is within the trial court's discretion and will not be reversed on appeal absent a "manifest and palpable abuse of discretion."  *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).  Prejudgment interest is appropriate to award (1) "when the amount of the obligation is certain" and not reasonably disputed and (2) "when the existence of the obligation itself is not disputed on reasonable grounds." *Id.*; *see also 101 Constr. Co. v. Hammet*, 603 S.W.3d 786, 802 (Tenn. Ct. App. 2019).  The purpose of awarding prejudgment interest is to compensate the prevailing party for the loss of use of the money to which it was entitled.  *Myint*, 970 S.W.2d at 927; *101 Constr. Co.*, 603 S.W.3d at 802.

Tenant asserts that the trial court incorrectly awarded Landlord prejudgment interest because Landlord failed to ask for this specific element of damages in the trial court proceedings.  Tenant overlooks Landlord's request for an award of prejudgment interest in its counterclaim filed on February 20, 2018.  The maximum rate of prejudgment interest a

trial court may award in Tennessee is ten percent. Tenn. Code Ann. § 47-14-123. Because we do not know the rate the trial court used in awarding Landlord prejudgment interest, and because we have modified the amount of late fees to which Landlord is entitled, we remand the case with instructions to calculate the prejudgment interest on Landlord's recalculated damages award of $19,359.35 ($11,700 (rent) + $2,364 (CAM/INS/TAX) + $4,922.40 (late fees)) using the annual rate of ten percent.

2. Attorney's Fees

Tenant's final challenge is to the trial court's award to Landlord of its attorney's fees. The trial court's order following trial included the following with regard to its award to Landlord of attorney's fees:

> [T]he Lease agreed to by both parties clearly states two (2) methods by which the Tenant may be liable for attorney's fees: 1) if Landlord must seek to recover unpaid rents from Tenant, and 2) if Landlord prevails in litigation or alternative dispute resolution against the Tenant. Based on the Lease Agreement, all proof at trial, and the arguments of the parties, the Court awards Kroger its attorney's fees and costs associated in the amount of $22,585.50.

Then, following Tenant's Rule 59 motion and a further hearing on damages and attorney's fees, the court increased Landlord's award of attorney's fees to $26,390.48 to account for additional work that was not included in its initial award of fees.

The parties' lease contained the following provision in the section entitled "Landlord's Remedies":

> Tenant shall remain liable to Landlord for damages for breach of this Lease and of Tenant's covenants hereunder in an amount equal to the total of . . . any broker's commissions, attorneys' fees, and other charges incurred in connection therewith or in connection with reletting the Leased Premises, including attorney's fees, expended in the collection of all Rents . . . .

The lease also contained a provision entitled "Attorney's Fees, Counterclaims and Jury Trial," which stated:

> If Landlord or Tenant . . . shall be made a party to any litigation or alternative dispute resolution commenced or against the other party and are not found to be at fault, the other party shall pay all costs, expenses and reasonable attorney's fees incurred by the successful party . . . in connection with . . . such litigation or alternative dispute resolution.

- 15 -

Tenant does not contest Landlord's right to collect attorney's fees if we affirm the trial court's judgment that Landlord is the prevailing party, which we do. However, Tenant challenges the amount the court awarded. Our Supreme Court has addressed awards of attorney's fees as follows:

> The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (citations omitted). The Tennessee Supreme Court has issued the following guidelines to assist in determining whether an attorney's fee is reasonable:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
> (8) whether the fee is fixed or contingent;
> (9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
> (10) whether the fee agreement is in writing.

TENN. SUP. CT. R. 8, RPC 1.5.

Landlord's attorney, Nicholas L. Vescovo, submitted a declaration in March 2019, following the trial, that includes copies of the invoices he sent to Landlord detailing the activities he performed, the amount of time he spent on each activity, and the hourly rate

he charged.  He explained that he normally charged between $225 and $250 per hour but charged Landlord an hourly rate of $140 in this case.  He stated that Tenant "unnecessarily complicated" the case and that "the volume of pleadings [Tenant] filed and the confusing nature of those pleadings obligated a great deal more work than a case such as this normally requires."  In addition, Mr. Vescovo stated that "this case was not a novel case but the actions of [Tenant] created unique issues that made the case more difficult and time consuming than necessary."

At the hearing on August 5, 2019, the trial court stated:

The Court entered a final order in this case on January 29th, 2019. As a part of that final order, the Court granted attorneys' fees to Kroger, one of the defendants in the matter, in the amount of $22,585.50. There were post-judgment matters that up and until March 15th, 2019, brought that amount to $26,418.48. Included in those post-trial matters was a Rule 59 motion to alter/amend support.

. . . .

And so there's been legal filings back and forth to get to today's date, and that is a hearing on those attorneys' fees. The Court has heard the proof today. There is an objection to several categories of fees, some of which involve items such as hotel stays and food, filing fees.

There was a self -- I guess a finding of a $28 fee from October 17th, 2018, that should not have been in the billing. But otherwise, considering the declaration, considering the type of case that the Court had before it, the Court finds that the attorneys' fees contained in the declaration are both reasonable and were necessary in this case.

Considering all the relevant case law in regards to what the Court has to consider in awarding attorneys' fees, the Court is going to reduce the request -- the final request for attorneys' fees [by] $28 and make the award $26,390.48.

Tenant argues that the attorneys' fees awarded are "not commensurate" with the "simple breach of contract matters" involved in this case and that "the issues were not complex." Tenant describes this case as "an ordinary collection matter," yet the appellate record contains six volumes of technical record, and this does not include the proceedings in general sessions court.  The issues may not have been complex, but the time required to represent Landlord in this case was extensive, and the trial court found the requested fees were justified and reasonable.  Tenant opposed Landlord's removal of the case from general sessions to circuit court, filed numerous versions of a complaint and amended

complaint, opposed Landlord's motion to continue a trial date, moved to dismiss Landlord's counterclaim, moved for partial summary judgment on Landlord's counterclaim, moved to alter or amend the trial court's judgment following trial, and opposed Landlord's request for attorney's fees. In addition to having to respond to Tenant's motions, Landlord's attorney was required to pursue Landlord's claims against Tenant and to defend Landlord from Tenant's claims by drafting a motion for more definite statement, drafting motions to dismiss and supporting memoranda, drafting various other responsive pleadings, preparing for and attending multiple hearings, preparing for and representing Landlord at trial, and opposing Tenant's Rule 59 motion to alter or amend the judgment.

Tenant complains that the trial court should not have awarded Landlord fees related to the general sessions proceedings because Landlord was not the successful party at that level. If Landlord had not appealed the case to circuit court and prevailed at trial, Tenant would have a good argument and Landlord would not be entitled to an award of fees. However, Landlord filed a counterclaim against Tenant in general sessions, asserting breach of contract, and the lease entitles Landlord to collect the fees it expended in the collection of rents. Regardless of which party prevailed in general sessions, Landlord expended fees at that level in an effort to collect its rents and is entitled to an award of those fees since it ended up as the prevailing party in circuit court.

Other fees that Tenant challenges include an appearance fee related to a particular attorney in Mr. Vescovo's office who was needed to cover a hearing in the case, a hotel expense incurred the night before the trial, fax fees, mailing fees, and certain line items. The trial court acknowledged Tenant's objections to Landlord's request for fees for "hotel stays and food, [and] filing fees," but it concluded, based on "the type of case that the Court had before it" that the amount of attorney's fees was "both reasonable and were necessary in this case."[7]

Because the determination of what constitutes a reasonable fee is subjective, based on the evidence and experience of the trial judge, *Wright*, 337 S.W.3d at 176, and because Tenant fails to demonstrate that the trial court abused its discretion in awarding Landlord fees and costs in the amount of $26,390.48, we affirm the trial court's award of attorney's fees to Landlord. Landlord did not request an award of the fees it incurred on appeal, so we do not address whether or not it would be entitled to these fees as well.

---

[7]Tenant also references the "loser pay" statute, Tenn. Code Ann. § 20-12-119, which allows a party prevailing on a motion to dismiss to collect fees up to $10,000. Landlord did not seek fees based on this statute, however, thus rendering the statute irrelevant to the issues on appeal.

### III. CONCLUSION

The trial court's judgment is affirmed, as modified, and the case is remanded for a calculation of the proper amount of prejudgment interest to award Landlord, using the annual rate of ten percent. Costs of this appeal shall be taxed to Tenant, Loans Yes, for which execution shall issue if necessary.

_____

ANDY D. BENNETT, JUDGE