IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 2000 Session

## JIMMY B. HILLARD, ET AL. v. BUDDIE RUTH FRANKLIN

**Appeal from the Chancery Court for Jefferson County**
**No. 97-031      Richard R. Vance, Judge, By Interchange**

**FILED SEPTEMBER 27, 2000**

**No. E2000-00402-COA-R3-CV**

---

This is a suit for specific performance. The plaintiffs entered into an agreement with the defendant to purchase certain real property for $80,000. Before the purchase was closed, a house on the property was destroyed by fire, and the defendant collected $35,000 as proceeds from her homeowners' insurance policy. The purchase of the property did not proceed to closing and the plaintiffs filed suit for specific performance of the contract at a purchase price of $45,000 -- this amount being the difference between the original purchase price and the insurance proceeds collected by the defendant. The trial court granted the plaintiffs summary judgment. The defendant appeals, contending that this case is not ripe for summary judgment. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

Douglas T. Jenkins, Rogersville, Tennessee, for the appellant, Buddie Ruth Franklin.

James S. MacDonald and Andrew J. Evans, Knoxville, Tennessee, for the appellees, Jimmy B. Hillard and wife, Wilma J. Hillard.

## OPINION

I.

The defendant, Buddie Ruth Franklin ("Seller"), entered into an agreement to convey certain real property to the plaintiffs, Jimmy B. Hillard ("Mr. Hillard") and his wife, Wilma J. Hillard ("Mrs. Hillard") (collectively, "Purchasers"). On or about March 11, 1996, Seller and Mr. Hillard signed a "Contract for Sale of Real Property." The signature line for Mrs. Hillard was left blank; but the plaintiff Mrs. Hillard testified in her deposition that she assents to the terms of the contract.

The contract provides for a total purchase price of $80,000. Purchasers were to pay $10,000 "at closing," and the balance in equal monthly installments over time. The contract does not specify a date for closing.

The contract contains a clause pertaining to Nancy Franklin, a mildly-retarded individual living in a mobile home on the property.[1] The contract mandates that Ms. Franklin be allowed to live on the property for the rest of her life. In order to provide for the contingency of Ms. Franklin becoming ill and leaving the property, resulting in an empty, ill-maintained trailer that Purchasers would be prohibited from removing, the contract provides as follows:

> Buyers agree that [Ms. Franklin] shall have the right to live in the mobile home and shall have the use of that portion of the subject property which she currently uses as a garden plot and a yard, so long as she occupies and maintains the trailer and has her own water supply. In the event that a period of three consecutive months pass without her occupancy in the mobile home, her privilege to live there is terminated, unless Nancy Franklin cannot return to her mobile home because of a medical condition that is not permanent in nature.

Shortly after Mr. Hillard and Seller executed the contract, the latter informed Purchasers that she was not satisfied with the wording of the paragraph concerning Ms. Franklin. Seller wanted the language modified to say that Ms. Franklin could remain in the mobile home until she died. Mr. Hillard told Seller that she could contact the attorney who drafted the contract for the benefit of both parties, Ben Strand, and word the paragraph as she saw fit.

Upon the execution of the original contract, Purchasers took possession of the property. Mr. Hillard then had some fencing and dozer work done on the property at a cost of approximately $2,240.

The main house located on the property was destroyed by fire on May 24, 1996. On June 6, 1996, Seller received a $52,900 check from her insurance company, $35,000 of which was reimbursement for loss of the dwelling.[2]

Mr. Hillard was out of the country from early June until the middle of August, 1996. Shortly after he returned, he was informed by Seller that she had received an offer to sell the property, as it existed after the fire, for $60,000. There is a dispute as to whether Seller informed Purchasers that they would have to match or beat the new offer. Mr. Hillard states in his deposition that, upon being asked to pay more for the property, he declined, informing Seller that he thought she had overvalued the property and that he was not prepared to procure the extra money. In any event, the parties agree that Seller eventually consented to close the transaction for $45,000, giving Purchasers credit for the

---

[1] The mobile home was not affected by the fire.

[2] The remaining amount was reimbursement for the loss of Seller's personal property.

$35,000 in insurance proceeds she had received.[3]   On October 3, 1996, the attorney who had prepared the original contract prepared a revised contract, promissory note, trust deed, and warranty deed reflecting the $35,000 credit to the original $80,000 purchase price.

The revised contract contains the following language regarding Nancy Franklin:

> Buyers agree that [Ms. Franklin] shall have the right to live in the mobile home and shall have the use of that portion of the subject property which she currently uses as a garden plot and a yard, so long as she occupies and maintains the trailer and has her own water supply.  In the event that she becomes a permanent resident in a nursing home or other type of care facility, her privilege to live there is terminated, unless Nancy Franklin cannot return to her mobile home because of a medical condition that is not permanent in nature.

Seller reviewed the revised documents on December 13, 1996.  She refused to sign the documents, objecting to the agreement on four grounds:

> 1.  The language regarding Ms. Franklin had been rearranged, but the substance had not changed.  Seller was of the opinion that the language did not adequately provide that Ms. Franklin could live on the property until she dies;
>
> 2.  Mrs. Hillard had still not signed the original contract;
>
> 3.  Seller had not yet received the $10,000 down payment called for in that contract; and
>
> 4.  The promissory note contained a provision that had not been discussed, *i.e.*, that payment was to be made in Dandridge.

Seller communicated her objections to Mr. Hillard on December 22, 1996.  The sale did not close, and Purchasers filed this action on March 24, 1997.  The trial court granted Purchasers' motion for summary judgment, ordering specific enforcement of the contract and fixing the total purchase price of the property at $45,000, being the original purchase price agreed to by the parties less the $35,000 that Seller had received as insurance proceeds.  This appeal followed.

---

[3] Seller asserts that she gave Purchasers another option in addition to abatement of the purchase price: rescission of the contract and reimbursement to Purchasers for the work Mr. Hillard had done on the property.

## II.

Before we determine whether summary judgment for Purchasers is appropriate, we must first examine the body of law relating to specific enforcement of contracts pertaining to the sale of real property.

"Specific performance is an equitable remedy." *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990). Generally, a court will not award specific performance of a contract unless an award of damages is deemed an inadequate remedy. *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979). Given that real property is unique, damages are generally deemed an inadequate remedy for breach of real estate contracts, and, accordingly, such contracts are generally eligible for specific performance. *See, e.g., McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998).

A contract must meet certain requirements before a court will decree specific performance. The contract must be "clear, complete and definite in all its essential terms." *Parsons v. Hall*, 199 S.W.2d 99, 100 (Tenn. 1947). It "must show beyond doubt that the minds of the parties actually met." *Id*. The contract must also be "free from any suspicion of fraud or unfairness." *GRW*, 797 S.W.2d at 614 (citing *Johnson v. Browder*, 185 Tenn. 601, 605, 207 S.W.2d 1, 3 (1947)). The determination of whether a contract should be specifically enforced lies within the discretion of the trial court and depends upon the facts of each case. *Shuptrine*, 597 S.W.2d at 730.

We now turn to the issue of whether summary judgment for Purchasers is appropriate under the record now before us. In deciding whether a grant of summary judgment is appropriate, courts are to determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 210-211 (Tenn. 1993).

Thus, the questions a court must consider in determining whether to grant or deny a motion for summary judgment are (1) whether a factual dispute exists; (2) whether that fact is material; and (3) whether that fact creates a genuine issue for trial. *Id*. at 214. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id*. at 215. A disputed material fact creates a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id*. The phrase "genuine issue" refers exclusively to factual issues and not to legal conclusions that could be drawn from the facts. *Id*. at 211.

The party seeking summary judgment has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. *Id*. at 215. Once the moving party satisfies its burden of showing that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to show that there is a genuine issue of material fact requiring submission to the trier of fact. *Id*. The nonmoving party cannot simply rely upon its

-4-

pleadings, but rather must set forth, by affidavit or discovery materials, specific facts showing a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.06; *Byrd*, 847 S.W.2d at 215. The evidence offered by the nonmoving party must be taken as true. *Byrd*, 847 S.W.2d at 215-216.

## III.

### A.

Seller first argues that the trial court erred in granting summary judgment because there was no meeting of the minds with respect to Ms. Franklin being allowed to live on the property. More specifically, she argues that the contract is incomplete because she signed it believing that the proper language would be added later, because the contract was never signed by Mrs. Hillard, and because the contract was never notarized.

"[T]he parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *GRW*, 797 S.W.2d at 610. Before a contract for the conveyance of real property can be enforced, the statute of frauds requires that it be "signed by the party to be charged." T.C.A. § 29-2-101(a) (Supp. 1999); *see also Patterson v. Davis*, 192 S.W.2d 227, 229 (Tenn. Ct. App. 1945). Evidence pertaining to the other party's acceptance of the contract may be by way of parol evidence. *Id*.

Based on the above rules of law, we find that there was a meeting of the minds regarding whether and under what conditions Ms. Franklin could remain on the property. The contract language regarding Ms. Franklin is clear and unambiguous. It provides that she has the right to live on the property unless she fails, for three consecutive months and for any reason other than a non-permanent medical condition, to occupy the mobile home. The contract being unambiguous in this regard, the court may not consider extraneous evidence indicating that Seller signed the agreement under the belief that the language would later be changed. Because such extraneous evidence may not be considered, it cannot constitute a disputed material fact rendering summary judgment inappropriate.

The remaining facts -- that Mrs. Hillard did not sign the contract and that the contract was not notarized -- are undisputed. Because Seller is "the party to be charged," the agreement is enforceable against her. The fact that Mrs. Hillard did not sign the contract is immaterial; she is not "the party to be charged" in this lawsuit. Her assent to the terms of the contract is reflected in her participation in this action as a plaintiff and her deposition testimony. *See id*.

Seller does not cite any authority for her assertion that the contract is incomplete due to the fact that it was not notarized, nor are we aware of any. The lack of a notary's acknowledgment is not material in this case where no one questions the validity of the signatures affixed to the contract.

The relevant facts in the record reflect, without equivocation, that there was a meeting of the minds in this case.

Seller next argues that Purchasers are not entitled to the remedy of specific performance because they breached the contract. More specifically, she contends that Purchasers breached the contract because, according to her, they did not tender the $10,000 down payment.[4]

We disagree. It is true that the remedy of specific performance "exists for the benefit of the aggrieved party to a breach of a contract and not to the party guilty of the breach." **Wall v. Thalco, Inc.**, 614 S.W.2d 803, 806 (Tenn. Ct. App. 1981). Purchasers, however, did not breach the contract. Under the terms of the agreement, Purchasers are obligated to tender their $10,000 down payment *at closing*. Because the transaction never closed, Purchasers' obligation to make the down payment was never triggered.

Both parties make much out of the reasons for which the transaction never closed. Purchasers assert that Seller delayed the closing, first because she desired to remove her personal property from the house prior to closing, and later because she desired to settle her insurance claim prior to closing. They further intimate that Seller balked at closing the transaction due to her desire to accept the higher offer she received subsequent to execution of the parties' contract. Seller, in contrast, contends that Purchasers delayed the closing due to their inability to raise sufficient funds to perform the contract.

Time is generally not of the essence "in the absence of an express stipulation, a manifestation of intention from the contract or subject matter involved, or an implication from the nature of the contract or circumstances of the case." **Commerce Street Co. v. Goodyear Tire & Rubber Co.**, 215 S.W.2d 4, 11 (Tenn. Ct. App. 1948) (quoting 12 Am. Jur. *Contracts* § 308 (1938)). The contract did not set a closing date, and the circumstances do not suggest that time was of the essence. The inescapable fact is that the transaction, for whatever reason, did not close. It follows that Purchasers' obligation to make the $10,000 down payment never arose, and hence, they did not breach the contract by not tendering the down payment. Therefore, we cannot say that summary judgment was inappropriate based on the assertion by Seller that Purchasers breached the contract by failing to tender the required down payment.

Seller next argues that the trial court's order was inappropriate because it did not adjudicate Ms. Franklin's interest in the property. We disagree. Purchasers, under the contract as specifically enforced by the trial court, have a legal obligation to Ms. Franklin as a third party beneficiary. There is no reason to address that obligation further because there is no indication that Purchasers will not comply with the terms of the contract as enforced by the trial court. There is no justiciable controversy, and thus, we cannot say that the trial court's "failure" to address Ms. Franklin's interest in the property renders summary judgment inappropriate.

Finally, Seller argues that the doctrine of laches precludes specific enforcement of the parties' contract. We find this argument to be without merit. Time was not of the essence of this contract.

---

[4] Seller also asserts that Purchasers breached the contract because Mrs. Hillard did not sign the contract. As we have already discussed, this fact is not a bar to the plaintiffs' suit.

Furthermore, regardless of the delay and which party was responsible for the delay, it is clear that Seller objected to the agreement for several reasons and did not intend to close the transaction. Any harm she may have experienced was thus self-inflicted, and not due to any alleged delay by either party.

While a number of post-contract facts are clearly in dispute, these disputes are not material to the central issue of whether Purchasers are entitled to specific performance of the contract executed by Seller. Assuming that Seller's version of these facts is true -- an assumption we must make in this summary judgment analysis -- none of those facts is a bar to the plaintiffs' claim for relief in this case.

For the foregoing reasons, we find and hold (1) that Purchasers have carried their burden of showing that there is no genuine issue of *material* fact; and (2) that Seller has failed to carry her burden to show the existence of such a disputed material fact spawning a genuine issue for trial. Therefore, we hold that the trial court did not err in granting summary judgment to Purchasers.

B.

The second issue raised on appeal is whether the trial court erred in reducing the purchase price of the property by the insurance proceeds received by Seller when the house on the property was destroyed by fire.

This court addressed a similar issue in *King v. Dunlap*, 945 S.W.2d 736 (Tenn. Ct. App. 1996). In that case, the sellers agreed to sell real property to a purchaser on an installment basis, with delivery of the deed to occur upon full payment of the purchase price. *Id.* at 737. The building on the property was destroyed by fire after the purchaser had made some payments, but before conveyance of the property. *Id*. At the time of the fire, the purchaser still owed the sellers $5,500. *Id*. at 738. The purchaser filed suit against sellers and their insurance company when sellers informed him that they intended to retain the entire $30,000 of insurance proceeds they had collected from their insurance company. *Id*. at 737, 738. The purchaser asserted that the sellers were only entitled to collect the balance owed on the property and that the purchaser was entitled to the balance of the insurance proceeds. *Id*. at 738. The trial court ruled in favor of the purchaser. *Id*. at 739.

The sellers' insurance company appealed, asserting that its only obligation was to the sellers and that the amount of the obligation was limited to the amount of the purchaser's outstanding indebtedness to the sellers. *Id*. at 741. In resolving this issue, we quoted extensively from the unreported case of *Parker v. Tennessee Farmers Mut. Ins. Co.*, C/A No. 141, 1988 WL 138923 (Tenn. Ct. App. E.S., filed December 30, 1988), which involved a suit between a seller and its insurance company under circumstances similar to those in *King*. Most pertinent to resolution of the instant case is the following language from *Parker*:

> In general ... where the insured vendor has sold the property and the
> vendee has gone into possession and paid a portion of the purchase
> price, but title is still held by the insured, as between the insured and

-7-

the insurer the insured is the owner of both the legal and equitable titles to the property and entitled to recover the full amount of the policy. However, as between the vendor and the vendee, the insured takes the proceeds of insurance which exceed the amount owed to the vendor, as trustee for the vendee.

*Parker*, 1988 WL 138923 at \*1. After quoting this portion of *Parker*, the opinion in *King* proceeds to quote portions of *Parker* examining cases in other jurisdictions holding to the same effect. *See King*, 945 S.W.2d at 741-744; *Parker*, 1988 WL 138923 at \*2-\*4.

We note that *King* and *Parker*, as well as the cases discussed in those opinions, deal primarily with the question of whether an insurance company is required to pay the full amount of the policy or whether its obligation is limited to the seller's beneficial interest in the property, *i.e.*, the unpaid balance of the purchase price. In the instant case, the insurance company has already paid the full amount of the policy to Seller, and the question at issue is whether the proceeds received by Seller must be applied towards the purchase price.

Because we have not found a Tennessee case squarely on point, we look to other sources for guidance. We begin by noting the following dicta from *King* and *Parker*:

> At 5A Appleman, *Insurance Law and Practice*, 212-15 (1970), it is stated:

>> The equitable rule has obtained in many states that where the building which was the subject of conveyance is destroyed or damaged, the vendor must apply the proceeds upon the purchase price and account for the balance to the purchaser. Other jurisdictions have stated the vendor must either apply the proceeds to the purchase price or to repairs. Nor would carrying out the contract without abatement of the purchase price after the building burned affect the purchaser's rights to the insurance money.

> Also, with regard to the rights to insurance proceeds, it is stated at 92 C.J.S., *Vendor & Purchaser*, § 296:

>> [T]he insurance money in a case of loss is as between the parties and the insurance company, payable to, and collectable by the vendor ... as between the vendor and the purchaser, the better rule would seem to be that it should belong to whoever must bear the loss resulting from the injury to the property. Hence, if the loss falls on the purchaser ... he is entitled to the

-8-

benefit of the insurance money, and if it is collected by the vendor, he will hold it for the benefit of the purchaser who will be entitled to credit therefor on the unpaid purchase price or on a mortgage indebtedness assumed by him as part of the purchase price.

*King*, 945 S.W.2d at 743-44; *Parker*, 1988 WL 138923 at *4.

Thus, according to this dicta, a seller must apply insurance proceeds to the purchase price, at least where the risk of loss falls on the purchaser. *See also* 55 Am. Jur. *Vendor and Purchaser* § 403 (1946).[5] The risk of loss during the period between execution of a contract for the conveyance of real property and the closing generally falls on the purchaser. *See* 27A Am. Jur. 2d *Equitable Conversion* § 13 (1996).[6]

In *Gilles v. Sprout*, 196 N.W.2d 612 (Minn. 1972), the Minnesota Supreme Court found this to be the majority rule and applied it to facts almost identical to those of the instant case. In *Gilles*, the issue was framed as follows:

Where an executory contract for the sale of improved real estate has no provision for insurance against loss by fire and the improvement is accidentally destroyed by fire while the vendee, pursuant to the contract, is in possession pending its performance by the parties, should the insurance proceeds covering the loss collected by the

---

[5] This section of *American Jurisprudence* provides that

[w]here the vendor carries in his own name insurance on the property which he has contracted to sell, and the loss occurs before title is conveyed to the purchaser, the purchaser's rights, as against the vendor, in respect of the proceeds of such insurance are determined ordinarily by whether the loss would fall upon the vendor or upon the purchaser….[W]here the loss would, in the absence of insurance, fall upon the purchaser, it is generally held that the latter may, if ready, able, and willing to complete the contract, require the insurance money to be used toward the reduction of the unpaid purchase money, although the contract was silent as to insurance.

55 Am. Jur. *Vendor and Purchaser* § 403 (1946).

[6] This section of *American Jurisprudence* provides that

[w]here an equitable conversion is effected by an executory contract for the sale of land…[t]he purchaser's interest under the contract is considered to be realty, and he or she is deemed to be the equitable owner of the property….As equitable owner, the purchaser bears the risk of loss on the property.

27A Am. Jur. 2d *Equitable Conversion* § 13 (1996).

vendor under a fire insurance policy, procured by him at his expense, be applied to reduce the balance of the purchase price owed by the vendee?

*Id*. at 613. The Court stated that it had examined the law of other jurisdictions and found that

the majority generally holds that where the vendee must bear the loss of an accidental destruction of the property pending completion of the sale, the vendor must credit the insurance proceeds to the contract price absent any contractual agreement to the contrary.

*Id*. at 613-14.

We find the reasoning of *Gilles* persuasive and apply it to the facts of the instant case. Accordingly, we find and hold that the trial court did not err in reducing the purchase price of the property by the amount of the insurance proceeds collected by Seller after the house on the property was destroyed by fire.

Seller argues that the rule should not apply because Purchasers were not in possession of the property. She admits that Purchasers initially took possession of the property subsequent to execution of the contract, but she asserts that she "apparently…regained possession of the property at some point because [Mr. Hillard] denied having possession in his discovery deposition…." An examination of the portion of Mr. Hillard's deposition Seller cites to as support for her contention reveals that Mr. Hillard did not affirmatively deny having possession. In response to being asked whether he had ever paid the $10,000 down payment, he responded:

No, because -- I've had it all the time but I've never took -- never was -- who do I give it to? I'd give it to nobody until I see I've got the property actually in possession.

We are of the opinion that the question of whether Purchasers were in possession of the property does not create a genuine issue because no jury could legitimately construe Mr. Hillard's comment as a denial that he was in possession of the property. Rather, he was explaining that the reason he did not tender the down payment was that he was unsure whether Seller was going to perform her contractual obligations. Seller admits that Purchasers were initially in possession. She states that she "apparently" regained possession based on her after-the-fact reading of Mr. Hillard's response to a different question. Therefore, we find no genuine issue of material fact relating to whether Purchasers were in possession of the property after execution of the contract.

In accordance with the above discussion, we find and hold that the trial court did not err in granting summary judgment to Purchasers, specifically enforcing the contract and abating the purchase price by the amount of insurance proceeds Seller received from her insurance company.

IV.

The judgment of the trial court is affirmed. The case is remanded for enforcement of the trial court's judgment and collection of costs, assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant.

_____
CHARLES D. SUSANO, JR., JUDGE