# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 18, 2024 Session

## ABRAHAM ANDERSON v. ALICE MUSICK ET AL.

**Appeal from the Chancery Court for Sevier County**
**No. 21-8-172 Telford E. Forgety, Jr., Chancellor**

FILED
OCT 24 2024
Clerk of the Appellate Courts
REc'd By _____

**No. E2024-00249-COA-R3-CV**

The Plaintiff sought specific performance related to a real estate transaction. The trial court denied relief, concluding that the series of papers introduced by the Plaintiff as a purported real estate contract between the parties did not constitute a valid contract. Furthermore, the trial court concluded that specific performance was inappropriate because the court could not discern the terms of the purported contract. The Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Matthew A. Grossman and Rebekah P. Harbin, Knoxville, Tennessee, for the appellant, Abraham Anderson.

M. Edward Owens, Jr., Knoxville, Tennessee, for the appellees, Alice Musick and Dallas Musick.

## OPINION

### I.

This suit has its origins in negotiations over the sale of a mobile home park and the surrounding land. Defendants Alice and Dallas Musick, an elderly couple, own a parcel of 50 acres of property which includes a mobile home park on approximately 20 of those acres and an additional approximately 30 acres of undeveloped land. The mobile home park is leased to Mohammad Tamaddoni, whose contract includes a right of first refusal should the property be offered for sale.

Abraham Anderson, a real estate investor who owns several mobile home parks, was looking to acquire additional mobile home parks. He identified the Musicks as potential sellers by searching Google Maps for mobile home parks and finding the owner information through a county website. Mr. Anderson appeared at the Musicks' home in 2018. Mr. Anderson testified he asked Ms. Musick, who answered the door, if the couple was interested in selling the mobile home park, and she asked him to return the next day because Mr. Musick was asleep. Mr. Musick, on the other hand, testified that Mr. Anderson actually came to the house numerous times while he was recovering from a serious medical issue. Mr. Musick testified that he did not speak with Mr. Anderson the first four or five times that Mr. Anderson came to the house.

At some point, the parties did begin to discuss a sale of the property. Mr. Musick testified that, during the course of negotiations, Mr. Anderson brought him numerous contracts to examine. The Musicks and Mr. Anderson agree that they discussed selling the property at three million dollars. According to Mr. Anderson, Mr. Musick wanted a seller financing arrangement to "save on capital gains." Mr. Anderson clarified that he did not believe that the sale was contingent on the seller financing arrangement requested by Mr. Musick.

During the course of their negotiations, the Musicks informed Mr. Anderson about Mr. Tamaddoni's interest and his right of first refusal to purchase the property. Mr. Anderson testified that Ms. Musick subsequently told him on September 22, 2018, that Mr. Tamaddoni did not wish to purchase the park. Mr. Anderson had been in the habit of recording telephone calls since the time he worked as an insurance salesperson, and he recorded this call. Ms. Musick did not initially recall the conversation about the right of refusal, but after a recording of a phone call was played, Ms. Musick acknowledged that she had told Mr. Anderson that Mr. Tamaddoni was not interested in the property and said, "[I]f you still wanted it, it is yours." On September 29, 2018, the parties signed a "Letter of Intent." The letter stated that a contract would be delivered to the parties to review and sign within 30 days but that the agreement could be voided by either party for any reason. Under "Other terms," the letter contained the handwritten statement, "Seller financed contract to purchase mobile home park and purchase the additional 30 acres of mostly undeveloped land shall be delivered to both parties to review and sign within 30 days." According to Mr. Anderson, however, the Musicks told him at this meeting that they needed to meet with Mr. Tamaddoni again before committing to the sale.

Mr. Anderson introduced a text message from Ms. Musick sent October 12th, stating, "Finally talked with [Mr. Tamaddoni], he doesn't want to buy park, you can bring your contract." Ms. Musick indicated that the contract was not intended to be a final contract for the sale of the property. According to Mr. Anderson, he spoke with the Musicks after Ms. Musick sent the text message and agreed to meet the next day. On October 13, 2018, Mr. Anderson brought the Musicks two copies of a "Purchase and Sale Agreement," to which the parties made some handwritten changes and which they

executed. Although both copies are signed by all parties, the two versions of the document are not identical. Mr. Anderson testified that he brought two copies because he had no portable copier. Both versions of the document contain a handwritten note that the only third-party interest in occupancy or possession is Mr. Tamaddoni's lease and an easement. The version produced by Mr. Anderson, however, also contains an asterisk with this notation, stating "will be cancelled," and Mr. Anderson's version also includes the property's address on the first page. Mr. Musick testified that the "will be cancelled" language was not on the document when he signed it.

According to the Musicks, they executed the October 13th contracts sometime after midnight. They assert that Mr. Anderson showed up unexpectedly at their home in the middle of the night and falsely represented to them that he had purchased Mr. Tamaddoni's lease interest and that the electricity in the park would be cut off if they did not sign the documents he brought. The Musicks testified that they did not understand the contracts to be final contracts to sell the property, and Mr. Musick testified that they expected Mr. Anderson to bring them a more final contract.

The October 13th agreement, which Mr. Anderson obtained from a "guy [he] met online [who] bought mobile home parks," provided that the purchase price was $3,000,000 and that Mr. Anderson was to pay $1,000 in earnest money within five days. The agreement stated that the remainder of the $3,000,000 was to be paid with a wire transfer, cashier's check, certified check "or other good funds" at closing. However, the agreement also provided, immediately after the parties' signatures, "Payment Schedule & Seller Financing Details To Be Affixed To This P&S Agreement." There were, however, no payment schedule or seller financing details affixed.

Mr. Anderson attached the October 13th agreement to his complaint, and he alleged in the complaint that "the purchase price for the Property was to be tendered through a seller financing arrangement." Mr. Anderson cited to this contract clause and to a later, handwritten document as fulfilling this proposition. Mr. Musick, on the other hand, testified that he did not recall the clause regarding seller financing being in the agreement, although he acknowledged it appeared in the version of the agreement attached to his Answer.

The agreement asserted that a description of the real property included in the sale, in "Schedule A," and a description of the personal property included in the sale, in "Schedule B," were attached. The record does not contain these attachments. The agreement also provided that the purchaser "warrants that it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Tennessee." However, there is no limited liability company named in the agreement, and Mr. Anderson was the signatory, was designated the "purchaser" in the agreement, and initiated the lawsuit. He testified that he intended to form an LLC at the time the parties signed the document. There is no indication in the record that he ever did so despite the

- 3 -

purchase and sale agreement indicating that the purchaser is an LLC.

The agreement also provided that closing would be no later than 30 days after the expiration of the purchaser's sixty-day inspection period, and it contained an arbitration provision which was to take place in Phoenix, Arizona, under Arizona law. Mr. Anderson testified that he paid the earnest money to a title company within the requisite time and introduced a check stub, although the Musicks testified that they had no knowledge of any such payment being made. The parties reviewed the agreement together, and there are two paragraphs, regarding title insurance and a survey, that were removed at Mr. Musick's request.

Although Mr. Anderson testified that the document was "crystal clear" and that he believed that, after signing, he "had the right to buy the property for what we agreed on," his subsequent actions were not those of a party operating under an understanding that he had signed a final binding contract. Instead, on October 25, 2018, Mr. Anderson presented a new contract to the Musicks. This contract was labeled "Real Estate Purchase Agreement" and was prepared by an attorney. The date on the form was "the ___ day of September, 2018." The purchase price was left blank in the contract, and the financing terms were not specified, although the contract stated that the balance of the purchase price would be financed by the sellers and contained a blank promissory note providing some of the terms of seller financing, including that monthly payments would be made over 60 months beginning in January 2020. The parties' names are in the contract, which provided for $3,000 in earnest money. Mr. Anderson testified that he presented the Musicks with this contract because the Musicks told him they wanted a new contract drafted for the sale of the property after meeting with their attorney. The parties did not sign this contract.

Mr. Anderson next attempted to negotiate an option to purchase the property. Mr. Anderson testified that he did not understand at the time that he could enforce the signed October 13th agreement. According to Mr. Anderson, on November 2, 2018, he discussed an option contract with the Musicks, "and we agreed to that and we wrote it out," creating an option agreement. Mr. Anderson described this as "a binding amendment to the contract." Mr. Musick, on the other hand, stated that Mr. Anderson gave the Musicks a three-by-five card with some terms one night at their daughter's house and then came back the next day with the figures written on a larger sheet of paper. Mr. Musick testified he refused the terms offered, noting that Mr. Anderson wanted to buy a three-million-dollar piece of property over seven years with no principal and no interest. The document is composed of notes in the form of sentence fragments and first-person statements. It begins, "$100K over 7 years for the option to purchase $100k % 7 = $14,285.71/year." It then lists the purchase price for the mobile home park as $2,000,000 and the purchase price for the remaining land as $1,000,000. It lists proposed monthly payments and states payments would start on the remaining $2,900,000 "once lease ends," which testimony established would be in 2025. The payments were proposed to be for a total of $2.9 million at 5% interest with a "30 year amortization for a 10 year period." The Musicks initialed the top

of this document, although they testified they did so at Mr. Anderson's request to acknowledge their receipt of the document and not in order to execute the document. Mr. Musick noted that he was eighty years old and would not have agreed to accept payment over a lengthy period of time. Mr. Musick testified that Mr. Anderson told them during the November 2nd meeting that he was unable to secure financing from a bank and that if they did not wish to finance the purchase, the deal was off. The Musicks testified that Mr. Anderson stormed off, slamming the door behind him. Mr. Anderson introduced an audio recording from November 2, 2018, of a telephone call with Ms. Musick, during which she stated that Mr. Musick would "not be able to do what you want," because he needed "more money up front." She discussed some terms of an option agreement.

Mr. Anderson testified that he presented the Musicks with yet another contract on November 14, 2018. He explained that he kept bringing new contracts to the Musicks despite purportedly having a binding contract because he wanted to keep them happy and was not sure of his rights. Mr. Anderson testified that this document was meant to formalize the option agreement because the Musicks had told him they did not want to sell but just to give him an option to purchase. However, the November 14th contract was for an outright purchase of the mobile home park, but with an option on the remaining approximately 30 acres. It provided that Mr. Anderson would pay only $7,142.86 of the two million due for the park at the closing, and it provided for seller financing according to the terms of a promissory note. That promissory note was not attached. Mr. Anderson testified he offered the Musicks $5,000 to sign the contract. They refused to do so. On November 20, 2018, Ms. Musick sent Mr. Anderson a text message that she could not meet that night because they had not yet consulted their attorney.

Mr. Anderson testified that on November 26, 2018, the Musicks informed him that Mr. Tamaddoni had changed his mind and that they would not sell the park. Mr. Anderson sent a certified letter to Mr. Musick on November 28th, asserting that he wanted to enforce "our signed contract." Mr. Musick testified he did not speak to Mr. Anderson between the November 2nd meeting and January. However, Mr. Anderson introduced a recorded December 3, 2018, telephone call in which Mr. Musick asked Mr. Anderson if he was at odds with Mr. Tamaddoni. Mr. Musick told Mr. Anderson that Mr. Tamaddoni was angry and wanted to enforce his right of refusal. He discussed the income potential of the park and told Mr. Anderson that he would "have to put some money up front" and that Mr. Tamaddoni was not inclined to negotiate if Mr. Anderson attempted "to go in with no money down." Mr. Musick nevertheless expressed that he wanted Mr. Anderson to buy the park.

Mr. Anderson returned in December or January[1] and offered the Musicks $5,000 to

_____

[1] Mr. Anderson testified this occurred on December 20, 2018, while Mr. Musick said it was in late January.

sign another copy of the November contract. The Musicks testified that they refused to proceed because they had by this point discovered that Mr. Anderson never purchased Mr. Tamaddoni's lease, despite what they testified was a false claim by Mr. Anderson to the contrary. Mr. Anderson testified that on January 11, 2019, Mr. Musick told him they would close if Mr. Tamaddoni did not want the park. Mr. Anderson introduced a January 15th text message from Ms. Musick stating that the Musicks wished to meet with Mr. Tamaddoni again but could close in February. Mr. Anderson unilaterally set a closing date in February 2019. He testified that prior to the closing date in February, Mr. Musick called him and told him he did not want to sell the park because he had received a higher offer. Mr. Musick testified that this was a "big lie." Although Mr. Anderson had recorded numerous other calls, there was no recording of this conversation. Mr. Anderson attributed the lack of recording of this conversation to having been out of state at the time.

At the conclusion of the bench trial, the trial court noted that there was no evidence of damages introduced and that any relief must accordingly be premised on specific performance. The court declined to award specific performance for two reasons. First, the court found that there was no enforceable contract between the parties. The court journeyed through the labyrinthian maze of documents, including the letter of intent, the October 13th agreements, which it characterized as internally inconsistent regarding method of payment, the unsigned October 25th agreement, the handwritten November 2nd option, and the unsigned option agreement from November 14th. The court concluded that these documents simply did not constitute an enforceable contract, although the trial court explicitly found there was no fraud. As a second independent basis for its conclusion, the court held it would exercise its discretion to deny specific performance. In so doing, the court noted that it simply could not determine the actual terms of the agreement that Mr. Anderson sought to enforce.

## II.

A trial court's findings of fact in a civil action are reviewed de novo on the record, accompanied with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013). Questions of law are reviewed de novo with no presumption of correctness. *Emory v. Memphis City Schs. Bd. of Educ.*, 514 S.W.3d 129, 142 (Tenn. 2017). "The determination of whether a contract has been formed is a question of law." *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 773 (Tenn. Ct. App. 2015) (quoting *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009)). A court's decision to award or deny specific performance of a real estate contract rests within the sound discretion of the trial court. *Hillard v. Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000). Appellate courts will set aside a discretionary decision by a trial court "only when the court that made the decision applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249

S.W.3d 346, 358 (Tenn. 2008).

### III.

Mr. Anderson asserts on appeal that the trial court erred in holding that there was no enforceable contract, pointing to the October 13th agreements and the November 2nd handwritten page as spelling out the terms of the contract. He also asserts that the court abused its discretion in declining to order specific performance. He does not appeal the trial court's determination that he is not entitled to damages, as no proof of damages was presented. The Musicks counter that the trial court properly determined that there was no valid contract and Mr. Anderson is not entitled to specific performance. We agree that the terms of the purported contract are so uncertain as to be unenforceable.

To prove a claim for breach of contract, a claimant must show: (1) the existence of a valid contract, (2) nonperformance of the contract amounting to a breach, and (3) damages caused by the breach. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). A contract is not formed unless the terms are reasonably certain. *See Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). While uncertainty as to "incidental or collateral" matters does not negate a contract, "[i]f the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." Restatement (Second) of Contracts § 33 cmt. a. (1981); *Cadence Bank, N.A.*, 473 S.W.3d at 774 (quoting *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991)). In evaluating whether a contract may be enforced,

> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Jamestowne*, 807 S.W.2d at 564 (quoting Restatement (Second) of Contracts § 33).

Specific performance is a remedy rooted in equity. *Hillard*, 41 S.W.3d at 111. When seeking specific performance, in particular, a contract "must be 'clear, complete and definite in all its essential terms.'" *Id.* (quoting *Parsons v. Hall*, 199 S.W.2d 99, 100 (Tenn. 1947)); *see Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979); *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990). "The Court will not make a contract for the parties and the agreement sought to be enforced specifically must show beyond doubt that the minds of the parties actually met and that they themselves made the agreement." *McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998) (quoting *Parsons*, 199 S.W.2d at 100). The Tennessee Supreme Court has identified "the

requirements of mutuality, clarity and definiteness in the basic elements of date, parties, a valid agreement to sell, and a description of what was agreed to be sold." *Parsons*, 199 S.W.2d at 100; *see Abbott v. Abbott*, No. E2015-01233-COA-R3-CV, 2016 WL 3976760, at *4 (Tenn. Ct. App. July 20, 2016) (citing cases for the proposition that "price is typically an essential term in a sales or services contract"); *Tetra Tech, Inc. v. Performa Entm't Real Estate, Inc.*, No. W2007-02244-COA-R3-CV, 2008 WL 4457061, at *5 (Tenn. Ct. App. Oct. 3, 2008) ("A contract may not be enforceable where an essential element, such as price or compensation terms, is determined to be indefinite."). When the terms are vague and indefinite, the contract becomes "unenforceable and, indeed, unintelligible." *Parsons*, 199 S.W.2d at 100.

Here, Mr. Anderson relies on the October 13th contract and the November 2nd handwritten note in arguing that the parties came to an agreement. The October 13th contract purported to be between the Musicks and an LLC which was never formed, but it was also signed by Mr. Anderson in his personal capacity as a party. Accordingly, there is some measure of uncertainty as to the parties to this alleged contract. It is not apparent whether the proper party to bring this action is Mr. Anderson or some unnamed LLC. Furthermore, the agreement is one for the sale of personal property as well as real estate. The real estate purports to be described in "Schedule A," which does not appear anywhere in the record. While the parties do not dispute that they were negotiating for the purchase of a specific piece of real property, the personal property to be bought and sold is doomed to obscurity, as there is likewise no "Schedule B" which was supposed to describe this property under the agreement. A deposition in the technical record includes testimony from Mr. Anderson that the personal property was meant to encompass the mobile homes. No testimony, however, was offered at trial identifying the personal property. Accordingly, the property that is the subject of the agreement is likewise unclear.

Additionally, the contract requires the purchaser (Mr. Anderson or a non-existent LLC) to pay the price with a wire transfer, cashier's check, certified check, or other good funds at the closing. However, it also states: "Payment Schedule & Seller Financing Details To Be Affixed To This P&S Agreement." Accordingly, the terms of payment are unclear, and — as the trial court found — internally inconsistent. While Mr. Anderson testified that it made no difference to him whether he paid in cash or through financing from the Musicks, there is conflicting testimony as to whether the Musicks wanted or did not want financing and whether Mr. Anderson was actually able to purchase the property without such financing. Additionally, the financing terms of a three million dollar financing extension by the seller would generally be a principal consideration to any purchaser and would certainly be an essential term to a seller agreeing to finance the sale. *See Jamestowne*, 807 S.W.2d at 564-65 (holding that a contract was not enforceable because it lacked the essential terms of a loan, "such as the amount to be loaned, the duration of the loan, how it was to be repaid, the rate of interest to be paid and when, [and] what security, if any, was to be given"). In fact, Mr. Musick testified that, in rejecting the November 2nd handwritten agreement, he told Mr. Anderson, "You know, at 5 percent

- 8 -

compounded, that is almost $2 million that I am giving you, that you want me to give you." Simply put, with the exception of the purchase price of three million dollars, none of the essential terms of a contract — the parties to the contract, the property to be sold, or the financial terms — are clear from the October 13th documents. *See LVH, LLC v. Freeman Inv., LLC*, No. M2020-00698-COA-R3-CV, 2021 WL 1943370, at *6 (Tenn. Ct. App. May 14, 2021) ("Even if we could construe paragraph 2 as sufficiently definite on the price term, paragraph 3 provides that the earnest money is to be returned to the buyer in the event the buyer and the seller cannot agree on a price. The plain and unambiguous language of the Agreement contemplates that the option price is to be agreed upon by the parties and that the parties may not agree upon it."); *LaQuiere v. McCollum*, No. M1999-00926-COA-R10-CV, 2001 WL 177079, at *6 (Tenn. Ct. App. Feb. 23, 2001) (specific performance was not appropriate when there was "no way to determine what per acre adjustment in price the parties agreed to"); *Lay v. Fairfield Dev.*, 929 S.W.2d 352, 355-56 (Tenn. Ct. App. 1996) (the terms of the alleged contract were not definite when there was "no evidence in the record to establish the time period during which [a party] would be entitled to a commission, duration of the contract or evidence relating to the sale of other property").

The handwritten November 2nd "amendment" upon which Mr. Anderson relies fares no better. We begin by observing that this handwritten document purports to be for an option to purchase rather than an outright purchase. Mr. Anderson does not assert this document is itself the entirety of the contract, but he urges us to read it together with the October 13th documents. Accordingly, the frailties of the October 13th documents, including ambiguity in the identity of the buyer and the property to be sold, as well as the method of payment, are carried over into this document. Moreover, reading the documents together makes another term of the agreement ambiguous: whether the purported contract is for an outright sale or for an option to purchase. *See Oliver v. Upton*, No. 01A01-9705-CH-00197, 1998 WL 151388, at *3 (Tenn. Ct. App. Apr. 3, 1998) ("Contrary to [the party's] contention, the memorandum and notes exchanged by the parties demonstrate their continued disagreement over basic terms of the sale contract" when the parties did not demonstrate an agreement as to price or how rental payments would be applied to the purchase).

Mr. Anderson asserts that the trial court found that there was no enforceable contract based on the "sole provision" regarding seller financing in the October 13th agreements. However, this is simply not so. The trial court found that from the various documents put forth by Mr. Anderson as constituting the contract, the October 13th agreements and the November 2nd handwritten document, the court could not determine either the financial terms or, indeed, whether Mr. Anderson was obtaining an option or purchasing property outright. Mr. Anderson, relying on caselaw involving deeds, attempts to resolve one inconsistency by urging us to strike the seller-financing provision because it appears below the signature line. *See Gambrell v. Nivens*, 275 S.W.3d 429, 437 (Tenn. Ct. App. 2008) ("Under Tennessee law, undated and unsigned writings located below the signatures and the certificate of acknowledgment in a deed do not constitute part of that deed."); *Anderson*

*v. Howard*, 74 S.W.2d 387, 390 (Tenn. 1934) (holding that an unsigned and undated clause below the signatures and certificate of acknowledgment in a deed, which was not part of the recorded deed, did not constitute part of the deed). However, both in his arguments before the trial court and in his Complaint, Mr. Anderson asserted that the November 2nd handwritten document provided a payment schedule for the sums due under the October 13th agreements. Accordingly, even if we were to accept the proposition that the phrase does "not constitute part of the deed," the payment terms are still uncertain.

The trial court ultimately concluded that there was no contract because it was unable to decipher the terms of the contract: "[T]he Court cannot tell what . . . the agreement was. I simply cannot tell." The trial court is certainly not alone. Mr. Anderson's counsel, during oral argument, was unable to relay to this court the terms of the alleged contract. When asked if the contract was for a seller-financed transaction or a cash sale, counsel stated that the November 2nd handwritten agreement "at best creates some sort of ambiguity" regarding the parties' intent and cited to the parties' course of conduct. The parties' course of conduct, however, establishes that negotiations regarding material contract terms continued well past both the October 13th agreements and the November 2nd "amendment." Counsel was also not able to articulate the terms of the seller financing in the November 2nd document. Asked about the function of the closing in February if the new contract was merely for an option, counsel stated, "I think when they said they were going to close in February, it was for the execution of the lease option." *See Cadence Bank, N.A.*, 473 S.W.3d at 774 ("It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." (citation omitted)). In sum, the documents at issue do not meet the requirement that "the contract must be clear, definite, complete and free from any suspicion of fraud or unfairness." *Shuptrine*, 597 S.W.2d at 730 (quoting *Johnson v. Browder*, 207 S.W.2d 1, 3 (Tenn. 1947)).

Accordingly, this court joins all who have examined the documents — the trial court, the Musicks, and Mr. Anderson — in concluding that certain essential contract terms are indecipherable. We affirm the trial court's conclusion that there was no contract.

IV.

For the aforementioned reasons, we affirm the judgment of the Chancery Court for Sevier County. Costs of the appeal are taxed to the appellant, Abraham Anderson, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE